Ann **FLANIGAN** and David
Flanigan, Plaintiffs,

v.

**KENT COUNTY SHERIFF'S DEPART-
MENT; Sheriff James R. Dougan; Ken
Kleinheksel; Michigan Department of
Social Services; and Len Blauwkamp,
Defendants.**

No. 1:92:CV:488.

United States District Court,
W.D. Michigan.

March 30, 1993.

Erik H. Jesson, Jonathon Golden, PC, Grand Rapids, MI, for plaintiffs.

Timothy E. Eagle, Varnum, Riddering, Schmidt & Howlett, Grand Rapids, MI, Frank J. Monticello, Asst. Atty. Gen., Frank J. Kelley, Atty. Gen., Tort Defense Div., Lansing, MI, for defendants.

## OPINION

ENSLEN, District Judge.

This matter is before the Court on two separate motions which will be considered together. The first is defendant Len Blaukamp's motion to dismiss and/or for summary judgment. The second is the motion to dismiss and/or for summary judgment of defendants Kent County Sheriff's Department, Kent County Sheriff James Dougan, and Detective Ken Kleinheksel (hereinafter collectively referred to as "the County defendants"). Both motions to dismiss also move for the imposition of sanctions.[1] The standards for summary judgment and dismissal are well-known, and I will not repeat them here.

Plaintiffs' four count complaint arises out of the defendants' investigation of a day care worker's report that Kelsey Flanigan, who was two years old at the time, told a story which indicated that she had been sexually abused by her "daddy."[2] Count I is a 42 U.S.C. § 1983 claim. Count II alleges malicious prosecution and/or abuse of process. Count III alleges intentional infliction of emotional distress. Count IV sought declaratory relief, but both parties acknowledge that it has become moot. Counts I–III seek damages and a permanent injunction enjoining defendants from taking "any further action against plaintiffs in this matter."

*Facts*

In the spring of 1992, plaintiffs participated in an interview with defendants Len Blauwkamp, a social worker with the Michigan Department of Social Services, and Detective Kleinheksel concerning the possible sexual abuse of Kelsey. During this interview, using anatomically correct dolls, the child described a "tail" on her "daddy" which was "ugly," "sticky" and "blue," and was placed against the child's body. In an affidavit attached to plaintiffs' complaint, the child's maternal grandmother, who was present during the interview, states that these responses were elicited by leading questions. After the interview Ann Flanigan agreed that she would not leave her husband alone with the child, and Kelsey was left in the custody of her parents.

Although the record is not precise on this point, it appears that during the interview plaintiffs and some defendants discussed the possibility of Mr. Flanigan taking a polygraph examination conducted by the Sheriff's Department. Shortly after this interview, plaintiffs retained attorney Erik Jesson. According to defendants, on the day defendant Kleinheksel had proposed as a potential date for a polygraph, plaintiffs' attorney called and informed defendant Kleinheksel that his client would not be appearing for the polygraph. In response, according to the affidavit of Erik Jesson, Jesson was informed that defendant Blauwkamp was already on his

---

1. This case also names the Michigan Department of Social Services (DSS). DSS filed a separate motion to dismiss on the basis of qualified immunity on December 16, 1992.

2. The Kent County Juvenile Court Petition filed by defendant Blauwkamp states the following: On 5–8–82 while in day care, Kelsey, while observing the dog wagging his tail, disclosed that her Daddy had a tail. The day care provider said that Daddies don't have tails. Kelsey then stated that her Daddy has one and that its [sic] blue, sticky and ugly. She then stated that he puts it in her mouth. She was asked where is Daddy's tail and she pointed between her legs. She was asked how it made her feel and she said that she cries and her Dad says he is sorry.
(County Defendants' Exhibit 1.)

way to pick up Kelsey Flanigan due to David Flanigan's failure to attend the polygraph examination. According to plaintiffs, their attorney subsequently spoke with defendant Blauwkamp, who agreed to refrain from removing Kelsey from their home temporarily until plaintiffs' attorney had a chance to confer with plaintiffs further.

Plaintiffs' attorney then had David Flanigan undergo two private polygraphs. Plaintiffs submitted to defendants the results of the two independent polygraph examinations, conducted by the same person, which reported that David Flanigan truthfully denied sexually abusing Kelsey. (Plaintiffs' Exhibit B.) In addition, Ann Flanigan indicates in her affidavit that she brought her daughter to a doctor to be examined for signs of sexual abuse. According to Dr. Sarah Alander's memorandum, she was asked to examine for injury due to allegations of sexual abuse. Dr. Alander states that "Kelsey was cooperative and had age-appropriate behavior during her exam. Her external genitalia and rectal exam were normal." (Plaintiffs' Exhibit C.) Plaintiffs also submitted this information to the defendants.

A central feature of plaintiffs' complaint is their contention that, in spite of the results of the polygraph and medical exam they submitted, defendants repeatedly threatened to remove the Flanigan's children if David Flanigan did not submit to a polygraph at the Sheriff's Department. Plaintiffs' attorney states that he had several conversations with defendants Kleinheksel and Blauwkamp in which they said that Kelsey would be removed from the home if David Flanigan did not submit to a polygraph at the Sheriff's Department. Plaintiffs' attorney also states that he was informed that defendants' decision was based on the policy of their respective employers and that they had no choice except to insist on the polygraph examination. However, Kelsey was never removed from the home, and David Flanigan never took a polygraph at the Sheriff's Department.

On June 15, 1992, shortly after this complaint was filed, a custody proceeding was initiated in the Juvenile Division of the Probate Court. *In re Kelsey Flanigan*, File No. 92–039500–NA, Hon. Nanaruth Carpenter. At the preliminary hearing on June 15, 1992, the referee ordered that David Flanigan have no contact with his children except for visits outside the home supervised by a person whose name is illegible in the order. (County Defendants' Exhibit 2.) On June 30, that order was modified to state that David Flanigan could have reasonable contact with the children in the family home under the direct supervision of their mother or another responsible adult. (County Defendants' Exhibit 3.) On October 26, 1992, the case was dismissed. (Plaintiffs' Exhibit F.) According to both parties the case was settled by "compromise," and according to plaintiffs, the resolution of the case required that the Flanigans engage in a minimum of two hours family counseling.

### Count II: Abuse of Process

In the complaint, this Count is titled "Malicious Prosecution/Abuse of Process." However, in their responsive brief, plaintiffs state that their use of the term "malicious prosecution" was in error, and they withdraw it. I therefore will analyze this claim solely as one for abuse of process.

In support of this count, plaintiffs argue that the term "process" in case law surrounding abuse of process claims is used broadly. On page 10 of their responsive brief, plaintiffs state that the removal of a child is the means by which a parent is notified of the action against them, and should therefore be considered the initial step or "process" in the abusive action. However, without commenting on the merit of plaintiffs' contention, I note that even using the standard they propose, plaintiffs' claim must fail. Although at one point plaintiffs' attorney was informed that defendant Blauwkamp was on his way to pick up Kelsey Flanigan due to David Flanigan's failure to attend a polygraph examination, that event never came to pass. I do not believe that the mere recitation of a statute pursuant to which the sheriff was allegedly acting under is sufficient to trigger "process." Therefore, even by plaintiffs' definition, no "process" was ever initiated.

■ Furthermore, a claim for abuse of process requires that there have been an ulterior motive which was improper or collateral to the intended use of a proceeding. *Bonner v. Chicago Title Insurance Co.*, 194 Mich.App. 462, 487 N.W.2d 807 (1992); *Vallance v. Brewbaker*, 161 Mich.App. 642, 646, 411 N.W.2d 808 (1987). While I realize that issues of state of mind, motive and intent generally are questions of fact which cannot be resolved in a motion for summary judgment, I cannot find a single point in all the pleadings in which plaintiffs allege an ulterior motive. Although plaintiffs describe defendants' actions in terms ranging from "misguided" to "terrorist," at no passage do plaintiffs claim that defendants' actions were driven by something other than a desire to insure Kelsey's safety. A plaintiff must come forward with *some* evidence of an improper ulterior motive in order to survive a motion for summary judgment; in this case plaintiffs do not even make the allegation directly.

■ Finally, the formal process which was initiated, the juvenile court proceeding, was the type of hearing plaintiffs originally requested in Count IV of this complaint. Plaintiffs requested this process so they could refute charges before their children were removed from the home. Therefore, I cannot imagine that this could be the "process" plaintiffs are claiming was abused.

Accordingly, summary judgment will be entered in favor of defendants on this count.

### Count I: § 1983

Count I is based on the alleged attempts of defendants Blauwkamp and Kleinheksel to coerce David Flanigan into making a confession. Plaintiffs allege that through this behavior, defendants acted under the color of state law to deprive David Flanigan of his Fifth Amendment right against self-incrimination, his Fifth and Fourteenth Amendment right to due process, and his Fourth Amendment right to be free of unreasonable searches. Viewing the facts in the light most favorable to the non-movants, as I must in a motion for summary judgment, defendants sought to force David Flanigan to choose between submitting to a polygraph at the Sheriff's Department and having his children removed from his home.

### The Fourth Amendment Claim

■ In a § 1983 action, the first question is whether state actors violated the plaintiff's constitutional rights. Because David Flanigan never took a polygraph at the Sheriff's Department, I find that no "searches" or "seizures" occurred. Therefore, his Fourth Amendment rights were not violated, and no § 1983 claim can be sustained on this basis.

### The Fifth Amendment Claim

■ Plaintiffs assert that defendants attempted to compel self-incriminating testimony from David Flanigan by threatening to take his children if he did not take their polygraph. Plaintiffs' Fifth Amendment argument is that if protection against compelled confessions is to be meaningful, it must also penalize the State when its attempt to coerce a confession is unsuccessful. I do not dispute the logic of plaintiffs' position. However, the Fifth Amendment is not "triggered" until a citizen is in custody. At the point of custodial interrogation, a detainee's rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), attach. At that point, if police obtain statements in violation of the detainee's Miranda rights, the Fifth Amendment prevents the state from utilizing that information at trial for most purposes.

■ In this case, if David Flanigan had gone to the Sheriff's Department for a polygraph in response to threats of his childrens' removal, it is likely that his visit would not be considered "voluntary," and therefore would be analyzed as a custodial interrogation in which his Miranda rights attached. However, that did not occur. Neither plaintiff was ever in custody, and therefore the defendants' actions cannot comprise a violation of plaintiffs' Fifth Amendment rights.

### The Due Process Claim

■ The Constitution flatly prohibits coercion in pursuit of a statement from a suspect, and coercive law enforcement tactics can violate due process guarantees whether they are successful or not. *Cooper v. Dup-*

*nik,* 963 F.2d 1220, 1244, 1244–45 (9th Cir. 1992) (en banc). Similarly, the fact that a civil plaintiff is never formally charged and that no statements are ever used against him or her does not extinguish a possible § 1983 due process claim. *Id.* at 1245.

Sitting *en banc* in *Cooper,* the Ninth Circuit provided an excellent overview of this area of law. *Cooper* involved a calculated police plan to intentionally violate the Miranda rights of a detained suspect. I will follow the *Cooper* court's lead in breaking the substantive due process claim into two theories or standards: the voluntariness standard and the "shocks the conscience" standard.

### The Voluntariness Standard

In *Culombe v. Connecticut,* 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961), the Supreme Court explained that "[t]he ultimate test remains that which has been the only clearly established test in Anglo–American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker?" *Id.* at 602, 81 S.Ct. at 1879. *Haynes v. Washington,* 373 U.S. 503, 514, 83 S.Ct. 1336, 1343, 10 L.Ed.2d 513 (1963), reiterates that the Fourteenth Amendment demands that statements taken from a suspect be the "voluntary product of a free and unconstrained will." *Haynes* acknowledges that the task this Court must undertake is not a simple one:

> The line between proper and permissible police conduct and techniques and methods offensive to due process is, at best, a difficult one to draw, particularly in cases such as this where it is necessary to make fine judgments as to the effect of psychologically coercive pressures and indictments on the mind and will of an accused.

*Id.* at 515, 83 S.Ct. at 1344. Finally, the fact-specific nature of the inquiry is reinforced by the Supreme Court's observation that

> the admissibility of a confession turns as much on whether the techniques for extracting the statements, as applied to *this* suspect, are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means as on whether the defendant's will was in fact overborne.

*Miller v. Fenton,* 474 U.S. 104, 116, 106 S.Ct. 445, 452–53, 88 L.Ed.2d 405 (1985).

In accordance with *Miller,* I stress that my analysis is limited to the facts before me. I make no ruling on whether the lack of a statement, or the lack of custody, necessarily precludes a due process claim based on police coercion. However, I hold that in this case, the facts indicate that, as matter of law, David Flanigan's will was not overborne.

■ The first fact in support of my conclusion is that David Flanigan was never in custody. Although I do not believe this circumstance is dispositive, the jurisprudence which has developed around police coercion and confessions has always considered persons in custody to be uniquely susceptible to coercion. Custody has special significance because law enforcement personnel have control over the detainee's movements, and the detainee is often cut off from friends and family. Custody greatly intensifies the potential for intimidation, and it can provide a forum the type of constant, sustained, and often relentless contact and questioning which wears down the "free will" the Court is concerned with here. *E.g., Haynes, supra,* (incommunicado detention and interrogation); *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (exhausted accident victim in hospital); *Cooper, supra,* (hours of mistreatment and psychological torture). Although the defendants certainly had some power over David Flanigan in this situation, the power dynamic between law enforcement personnel and a suspect are quite distinct when the contact occurs through the mail, over the telephone, or information is relayed by third persons. Because most of the cases in this area deal with the coercion of persons who are in custody, I must take this distinguishing factor into consideration.

Secondly, as soon as they left the initial interview, the Flanigans retained an attorney. This fact also alters the power dynamic between plaintiffs and defendants. A free person who has an attorney as an intermediary is better able to act of "free will" than one in custody without an attorney. A person in this situation can resist what they

believe to be unfair, harassing or coercive police behavior.[3]. For example, in this case, the Flanigans responded to the threats by asking their attorney to quickly file this law suit in order to insure that their children were not removed without a hearing. Furthermore, the pleadings indicate that the threats to take the Flanigans' children if David Flanigan did not submit to the Sheriff's polygraph were made to the Flanigans' attorney.

Thirdly, and perhaps most importantly, David Flanigan exercised his right to remain silent throughout. It appears from the record that he never spoke directly to the Sheriff's Department after his initial interview. Again, I do not think that the fact that he resisted talking to the Sheriff's Department determines that defendants' conduct did not violate the due process clauses. As stated above, unsuccessful attempts at coercion may amount to due process violations. However, every due process case I have cited and reviewed involves some statement. Whether those statements are inculpatory or not, the inquiry revolves around whether they were the product of a will overborne. In this case, there is no "product." The fact that Mr. Flanigan did not speak to the police after the initial interview suggests that his will was not overborne by the defendant's threats.

■ In short, in this case a suspect exercised his right to counsel and exercised his right to remain silent. He was never brought into custody, and he never made a statement to the police. The defendants never acted on their threat to take the children, and the plaintiff never acceded to their demand that he take a polygraph at the Sheriff's Department. Furthermore, plaintiffs filed a civil suit to enjoin defendants from doing what plaintiffs perceived to be illegal or unfair, taking their children, approximately three weeks after their initial interview. Of course, the fact that plaintiffs took these steps, and achieved a particular result, does not make the conduct of the State officials in this case right, good, or fair. I express no

opinion on the propriety of the defendants' actions. I also express no opinion on the merit of any state law tort claim plaintiff may possess. However, in the limited context which I have been asked to consider, a claim of the violation of constitutional substantive due process rights, which is tested by the "will overborne" standard, the facts of this incident lead me to conclude that defendants' behavior did not violate the due process clause. And, as explained earlier, the fact that there was no custody militates a finding that there was no Fifth Amendment violation.

### The "Shocks the Conscience" Standard

The second Fourteenth Amendment substantive due process test available to plaintiffs as a theory of § 1983 liability is contained in *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). The test is whether the defendants' actions "shocks the conscience." *Id.* at 172, 72 S.Ct. at 209. In *Rochin*, the Supreme Court defined such police conduct as that which "offend[s] those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous of offenses." *Id.* at 169, 72 S.Ct. at 208.

■ The "shocks the conscience" standard compels me to consider the element which makes this case somewhat unique among the due process cases I have cited earlier in this opinion. In this case, the "threat" is rendered less shocking by the fact that it concerned the subject of the investigation. The defendants did not threaten to burn down the Flanigan's home; they did not threaten to beat Mr. Flanigan. Put another way, the "choice" was not between taking a polygraph concerning a bank robbery and loosing his children. Instead, the defendants threatened to take an individual who they suspected was a victim of sexual abuse out of an environment which they suspected to be dangerous. Child abuse often is an ongoing

---

3. The fact that a citizen resists police coercion does not legitimize that coercion. However, the particular test for the substantive due process right I am presently examining requires courts to engage in a fact-specific analysis of whether the accused's will was overborne. The tools or circumstances which the plaintiff had at his or her disposal to "fight back" and resist are important indicators of whether eventual statements were a product of his or her free will.

crime. Therefore, the purpose of defendants' investigation was not only to determine whether a crime occurred in the past, but to prevent future sexual abuse as well. Swift resolution of the allegations had the potential to prevent additional abuse of Kelsey, if in fact such abuse was occurring.

Furthermore, it is likely that the defendants had a legal right to carry out the action they "threatened" to do.[4] M.C.R. 5.963 allows officers to take a child into temporary custody without a court order if they have reasonable grounds to conclude that the health, safety or welfare of the child is endangered.

In their complaint, plaintiffs claim that defendants' threats to remove Kelsey from her home were based on consideration other than the child's welfare. However, there is no suggestion what the alternative considerations may have been, except an inference from the rest of the Complaint that the defendants wanted to remove Kelsey *in order to* get David Flanigan to take a polygraph test. An explanation which is, at minimum, equally likely is that the defendants viewed his refusal as reinforcement for their suspicions that it was not safe for Kelsey to be in the home with her father. Although juries are not permitted to draw any inference from a defendant's silence. The Constitution does not prohibit investigators from doing so. In our daily lives, we all have drawn conclusions from a person's refusal to speak. It is not unconstitutional for investigators to ask a suspect to take a polygraph. In addition, there is no constitutional violation if those investigators consider a suspect's refusal to take a polygraph at the Sheriff's Department as one piece of information or evidence among many tending to prove or disprove their suspicion of abuse. For the foregoing reasons, I cannot conclude that the conduct alleged meets the high "shocks the conscience" standard.

■ In summary, I find that the actions of the defendants did not violate plaintiffs' Fifth, Fourteenth, or Fourth Amendment rights. Although defendants may have done so if they had carried out what they threatened to do, a state actor's threat to violate a citizen's constitutional rights is not actionable under § 1983. *Macko v. Byron,* 576 F.Supp. 875, 880 (N.D.Ohio), *aff'd,* 760 F.2d 95 (6th Cir.1985). Therefore, this Count will be dismissed pursuant to Rule 12(b)(6), because it fails to state a claim.

### Count III: Intentional Infliction of Emotional Distress

Plaintiffs' complaint alleges that Sergeant Kleinheksel committed the tort of intentional infliction of emotional distress in carrying out his criminal investigation. All of plaintiffs' federal claims have been dismissed, and their dismissal does not aid the resolution of this pendent state law claim. Therefore, in light of considerations such as judicial economy and comity with state courts and the strong policy against exercising pendent jurisdiction where all federal claims are dismissed, I dismiss Count III without prejudice. *See, Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350–51, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988).

### Count IV: Declaratory Relief

This Count is dismissed as moot.

### Sanctions

The defendants have also moved for the imposition of sanctions for the filing of a frivolous claim. Although I have concluded that the Flanigan's claim is not strong enough to survive a motion for summary judgment, I do not believe this filing rises (or sinks, as the case may be) to the level necessary for imposition of Rule 11 sanctions. Furthermore, I note that in their reply brief of December 7, 1992, the County defendants dedicate an entire section of their brief to a discussion of *Cooper v. Dupnik,* 924 F.2d 1520 (9th Cir.1991), a case favorable to their position, and urge the Court to follow it. However, this case was reheard *en banc* by the Ninth Circuit and reversed on May 5, 1992, seven months before the County defen-

---

**4.** I express no opinion on whether the evidence amassed at the time of the "threats" amounted to reasonable grounds. I note, however, that in a document entitled Record of Preliminary Hearing, dated June 15, 1992, Referee Jennifer Mallal made a finding of probable cause that one or more of the allegations in the family court petition were true. (County Defendants' Exhibit 2.)

dants cited it. The reversal of *Cooper* had a dramatic effect on the analysis I engaged in above. Therefore, complaints of sloppy lawyering can flow in both directions in this case. As a result, this aspect of defendants' motion will be denied.

### Conclusion

I understand that plaintiffs feel violated. However, when state officials are confronted with allegations of child sexual abuse, they must walk a treacherous tightrope. If they intervene without enough evidence of abuse, they risk the humiliating and damaging an innocent family. However, if they err too far on the side of caution, they risk allowing the sexual exploitation of a child to continue. Both of these horrible consequences can deal severe blows to persons and families.

In this case, state officials had a duty to investigate a report that Kelsey had been sexually abused. While the manner in which they pursued that investigation may not have been ideal, I cannot conclude that it violated the Constitution of the United States. Therefore, the County defendants and defendant Blauwkamp will be dismissed from this case.[5]

Additionally, although DSS is not a party to the two motions I have considered, because I have found that plaintiffs suffered no violation of their constitutional rights, this complaint cannot be maintained against DSS either. Therefore, the entire case will be dismissed.

### *JUDGMENT*

In accordance with the Opinion entered on this date;

**IT IS HEREBY ORDERED** that the motion to dismiss of defendants Kent County Sheriff's Department, Dougan and Kleinheksel (dkt. # 10), filed October 26, 1992, is **GRANTED.** Counts I, II and IV are **DISMISSED with prejudice.** Count III is **DISMISSED without prejudice.**

**IT IS FURTHER ORDERED** that the October 26, 1992, motion for the imposition of sanctions filed by the defendants Kent County Sheriff's Department, Dougan and Kleinheksel (dkt. # 10), is **DENIED.**

**IT IS FURTHER ORDERED** that the motion to dismiss of defendant Len Blauwkamp (dkt. # 4), filed July 30, 1992, is **GRANTED.** Counts I, II and IV are **DISMISSED with prejudice.** Count III is **DISMISSED without prejudice.**

**IT IS FURTHER ORDERED** that the motion of defendant Len Blauwkamp for Rule 11 sanctions (dkt. # 4), is **DENIED.**

**IT IS FURTHER ORDERED** that the motion of the Michigan Department of Social Services (DSS) to dismiss and for Rule 11 sanctions, filed December 16, 1992 (dkt. # 21), is **DENIED as moot.**

**IT IS FURTHER ORDERED** that this case is **DISMISSED.**

---

5. I note that defendants forwarded a procedural argument for the dismissal of defendant Kleinheksel. Because I have dismissed the case on the merits, I will not reach that argument.