**Douglas McCRAY, et al., Plaintiffs,**

v.

**CITY OF DOTHAN, et al., Defendants.**

**No. Civ.A. 99–D–55–S.**

United States District Court,
M.D. Alabama,
Southern Division.

Oct. 2, 2001.

---

Livingston, Lee & McInish, Freddie Lenton White, II, The City of Dothan, Dothan, AL, for Defendants.

### MEMORANDUM OPINION AND ORDER

DE MENT, District Judge.

### I. INTRODUCTION AND PROCEDURAL HISTORY

Plaintiff, Douglas McCray ("McCray"), initiated a lawsuit against the City of Dothan, Alabama ("the City") and various police officers, including Adrianne Woodruff ("Woodruff"), Jeffrey Howell ("Howell"), Tim Ward ("Ward"), Greg Carpenter ("Carpenter"), David Carmichael ("Carmichael"), and Stacy Robinson ("Robinson")[1] arising out of events which occurred during and after an altercation with police in a Dothan restaurant. As amended, the complaint contains thirteen counts.[2] Counts One through Seven set forth constitutional claims pursuant to 42 U.S.C. § 1983. Counts One and Two allege Defendants violated McCray's Fourteenth Amendment equal protection rights by discriminating against him on the basis of race (African–American) and disability. Count Three states a claim for a violation of the Fifth Amendment privilege against selfincrimination. Count Four is a claim which states Defendants violated the Fourth Amendment protection against unlawful seizure. Count Five alleges Defendants used excessive force in violation of the Fourth Amendment. Count Six states a Fifth Amendment claim for deliberate indiffer-

Bobbie S. Crook, Bobbie S. Crook, P.C., Dusty L. Harrell, Dusty L. Harrell, PC, Dothan, AL, Laura M. Hitt, Gordon, Siberman, Wiggins & Childs, Ann C. Robertson, Gordon, Silberman, Wiggins & Childs, Birmingham, AL, for Plaintiffs.

Collier H. Espy, Jr., Espy, Metcalf & Poston, Dothan, AL, Floyd R. Gilliland, Jr., Alex L. Holstsford, Rick A. Howard, Nix Holtsford Gilliland Lyons & Higgins PC, Montgomery, AL, Alan Carpenter

1. For ease of reference, the court refers to the defendant police officers collectively as "police defendants."

2. On March 28, 2000, the court granted Plaintiffs leave to file an amended complaint (Doc # 41). By order dated March 28, 2000, the court ruled on Defendants' motions to dismiss and dismissed all claims against the individual defendants in their official capacities, a race discrimination claim asserted under § 1981, and state claims against the City of Dothan for assault and battery, malicious prosecution, and intentional infliction of emotional distress (Doc # 43).

ence to serious medical needs. Count Seven is a Fourth Amendment malicious prosecution claim. Counts Eight and Nine state claims against the City under the Americans with Disabilities Act ("ADA") and. The Rehabilitation Act, respectively. In Count Ten, the remaining federal cause of action, McCray alleges that Defendants conspired to deprive him of equal protection rights under 42 U.S.C. § 1985(3). In Counts Eleven through Thirteen McCray asserts state law claims against police defendants for assault and battery, false imprisonment, malicious prosecution and intentional infliction of emotional distress.[3]

This matter is before the court on the City's Motion For Partial Summary Judgment and the police defendants' Motion For Summary Judgment ("Motions"), both filed May 17, 2001.[4] McCray has filed an appropriate response. After careful consideration of the arguments of counsel, the relevant law, and the record as a whole, the court concludes that Defendants' Motions are due to be granted in part and denied in part.

## II. JURISDICTION AND VENUE

The court exercises subject matter over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1343 (civil rights jurisdiction), and 28 U.S.C. § 1367 (supplemental jurisdiction).

The Parties do not contest personal jurisdiction or venue.

## III. FACTUAL BACKGROUND[5]

On July 24, 1997, McCray, an African–American male, went with his children, Ariel and Douglas, ages four and three, to a Quincy's restaurant in Dothan.[6] At the restaurant, he parked his green Hyundai in the space adjacent to a white Corvette.[7] Ariel exited the car from the passenger side and, in so doing, damaged the white car in the next space.[8] Because McCray is deaf, he did not hear any impact when she opened the door.[9] Wayne Hart, the White owner of the Corvette, claims he observed the damage which Ariel caused to his car from inside the restaurant.

After McCray and the children entered the restaurant, Hart approached them.[10] When Hart attempted to initiate a conversation with McCray about the damage to his car, McCray gestured that he was deaf.[11] McCray also instructed Ariel to communicate to Hart that he was deaf, and she complied.[12] After further attempts to verbally communicate with McCray failed, Hart went to speak with a server and ultimately, a manager who called the police.[13]

Police defendant Woodruff was dispatched to what she described as "a pri-

---

3. McCray's minor children, Douglas and Ariel McCray, join in asserting the intentional infliction of emotional distress claim.

4. The City does not move for summary judgment on the state law claim for false imprisonment.

5. The factual background has been prepared from the parties' submissions. Because the present matter is a motion for summary judgment, the facts, to the extent that they are disputed, have been construed in the light most favorable to the non-movant. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

6. Deposition of Douglas McCray ("McCray Dep.") at 99:12–14.

7. McCray Dep. at 99:14–17.

8. *Id.* at 99:18–19.

9. *Id.* at 99:19–20.

10. *Id.* at 100:1–3; 120:21; 121:10–15.

11. *Id.* at 100:3–4.

12. *Id.* at 100:4–6.

13. Deposition of Wayne Hart ("Hart Dep.") at 60:22–23.

vate property traffic incident" at a Quincy's restaurant in Dothan, Alabama.[14] When she arrived, Hart told Woodruff that while he was inside Quincy's he saw a small green car driven by McCray pull into the parking space next to his car. As a child exited the passenger side of the green car, Hart claimed she had flung the door open and damaged his car.[15] Hart told Woodruff that when he approached McCray to speak with him about the damage, McCray appeared uncooperative.[16] Although Hart also told her McCray was deaf, he indicated that if she faced McCray when talking to him, he could understand what she said.[17]

Woodruff entered the restaurant in search of McCray to obtain his name and address so that Hart could contact him about the damage. She admits that she then had no reason to think that McCray had committed any crime.[18] She further concedes that there was no indication that McCray himself had caused any property damage.[19]

By that time, McCray and his children were seated in a booth and eating dinner.[20] When Woodruff approached McCray and introduced herself, he pointed to his ears to indicate that he was deaf.[21] He further indicated he could not read lips.[22] Woodruff then attempted to communicate with McCray by writing questions on a piece of paper. McCray is pre-lingually deaf which means he lost his hearing before he learned to speak.[23] Thus, he communicates through American Sign Language.[24] Because English is a second language for him, some concepts in it are unfamiliar to him and it is difficult for him to communicate using written notes.[25]

In her first written question, Woodruff asked McCray if he owned the green Hyundai parked outside the restaurant.[26] McCray nodded to indicate an affirmative response.[27] McCray indicated that he did not understand a second question which asked who was driving the car.[28] Woodruff then wrote another message to advise McCray of Hart's claim about damage to his car.[29] Because he did not fully understand what Woodruff was asking him,[30] McCray then made a written request for an interpreter (misspelling it as "inderprter").[31] Woodruff became angry and left the restaurant.[32] McCray asked a server to

---

14. Woodruff Preliminary Hearing Testimony ("Woodruff P.H.T") at 1. None of the pages to this hearing transcript are paginated. Therefore, the court's reference to page numbers is to sequential page order.

15. Deposition of Adrianne Woodruff ("Woodruff Dep.") at 16:20.

16. Woodruff P.H.T. at 2.

17. Hart Deposition ("Hart Dep.") at 67:5–8.

18. Woodruff Dep. at 16:9–15; 41:14; 42:8–21.

19. *Id.* at 87:20.

20. McCray Dep. at 99:10–100:23.

21. Woodruff P.H.T. at 2.

22. McCray Dep. at 137:2–3.

23. *Id.* at 83:12–84:12.

24. *Id.* at 28:7 –10; 84:21.

25. *Id.* at 28:7–10.

26. Woodruff Dep. at 75:3–8.

27. McCray Dep. at 101:13–14;

28. Woodruff Dep. at 75:3–8; McCray Dep. at 101:14–16; 133:9–10.

29. Woodruff Dep. at 75 lines 3–8.

30. McCray Dep. at 147, line 22–148, line 2.

31. Woodruff Dep. at 75:3–8.

32. McCray Dep. at 101:21–23, 133:14–16, 134:16–17; Amy McGraw Affidavit ("McGraw Aff.") at 2.

call an interpreter and she called Kim Stanford, McCray's wife, who was able to interpret for him.[33]

When Woodruff returned, she gave McCray a written note which asked him to produce his identification.[34] After McCray indicated he did not understand the word "identification," Woodruff clarified that she wanted his driver's license.[35] McCray shook his head to indicate yes, and put his hands up to indicate that Woodruff should wait.[36] At that point, Woodruff contends that one of McCray's children told her that McCray could talk. When Woodruff asked the child why McCray would not talk to her, the child replied: "I don't know but he can talk." McCray denies that Ariel attempted to communicate with Woodruff.

Following that exchange, McCray wrote on a piece of paper: "my interpreter will be here soon. This is not right. Because I am deaf, you know, there's a lawsuit, must be with an interpreter." [37] When Woodruff inquired how soon the interpreter would arrive, she said McCray looked at her as if he did not know.[38] Woodruff spoke to McCray in an angry tone and again left the restaurant.[39]

Woodruff testified that she attempted to question McCray so that she could complete a "property damage report." [40]

However, for reports on noncriminal private property damage, there is no requirement that anyone participate in the completion of the report, other than the person who contacted the police.[41] Woodruff did not ask McCray to fill in information on a report.[42] Although Woodruff states that she also wanted to assist Hart by getting McCray's name and address, she concedes she never asked McCray for that information.[43]

Woodruff claims that she when realized there would be a problem in gaining McCray's cooperation in those endeavors, she went outside to call her supervisor.[44] Woodruff told her supervisor, Tim Ward, that she encountered resistance from McCray in gathering information for a report on property damage to Hart's car.[45] She testified that she also told Ward that McCray had an interpreter on the way and asked if she should get an interpreter.[46] Ward denies she asked him if an interpreter should be obtained for McCray.[47] Ward testified that he was dispatched because he was told Woodruff needed a supervisor on the scene.[48]

Woodruff also advised the police dispatch operator to send a backup police officer "[b]ecause the situation was unusual and [she] wanted to make sure that

**33.** Deposition of Kim Stanford ("Stanford Dep.") at 38:12–16.

**34.** Woodruff Dep.Ex. 4; Woodruff P.H.T. at 10; McCray Dep. at 102:1–3.

**35.** Woodruff Dep.Ex. 4.

**36.** McCray Dep. at 102:5–6; 103:11–13; 162:17–19.

**37.** Woodruff Dep.Ex. 4; McCray Dep. at 164:2–11.

**38.** Woodruff P.H.T.

**39.** Michael McGraw Affidavit ("McGraw Aff.") at 2.

**40.** Woodruff Dep. at 33:9–13.

**41.** Deposition of Tim Ward ("Ward Dep.") at 42:11–14.

**42.** Woodruff Dep. at 31:10–12.

**43.** *Id.* at 80:9–12.

**44.** Woodruff Dep. at 84:1–85:4; Woodruff P.H.T at 11.

**45.** *Id.*

**46.** *Id.*

**47.** *Id.*

**48.** Ward Dep. at 73:10–15.

nobody got hurt." [49] She admits, however, that when she asked for backup, McCray had not done anything to indicate he was violent.[50] Woodruff further testified that she had reason to suspect McCray might possibly be involved in criminal activity because he refused to answer her questions.[51]

Defendant Howell was dispatched to assist Woodruff with a "disorderly person." [52] However, Howell admitted that when he arrived, McCray was not behaving in a disorderly fashion.[53] Howell also conceded that Woodruff told him McCray was deaf and that she felt that he was being uncooperative, in part, because he had discontinued written communication with her.[54] Woodruff also told him that McCray had refused to provide his license or any other basic information.[55]

After Ward and Howell arrived on the scene, according to Ward, Woodruff explained Hart's allegations and she further described the situation as an incident of property damage, without clarifying that it was an incident of private property damage.[56] Acting upon Ward's instructions, Woodruff re-entered the restaurant with Howell to get McCray to come outside and to provide information that would be used to complete a property damage report.[57] Immediately after that, two other officers, Carmichael and Carpenter, arrived at the scene.[58]

When Woodruff and Howell reached the booth where McCray was sitting, they again attempted to communicate with him verbally.[59] McCray indicated with gestures that he wanted to communicate by exchanging written notes.[60] One of the male officers refused that request.[61] Woodruff motioned for him to stand up and come outside. McCray looked up and shook his head to indicate "no." [62] Woodruff verbally asked McCray again and motioned for him to stand up and to come outside the restaurant.[63] McCray shook his head "no," pointed to his children and continued eating.[64] Woodruff touched his elbow twice and McCray pulled away from her each time.[65] Then, as Woodruff and Howell both grabbed McCray to make him stand and to pull him from the booth, McCray began swinging his arms because he thought the officers were going to handcuff him.[66] Woodruff admitted at the time she and Howell pulled on his arms, McCray was not under arrest. McCray claims that Howell pulled him up from the booth and slammed his face into a table, which broke.

49. Woodruff Dep. at 101:22–102:5.

50. *Id.* at 103:23–104:6.

51. Woodruff Dep. at 103:23– 104:6; 174:14–16.

52. Deposition of Jeffrey Howell ("Howell Dep.") at 71:22–72:6.

53. *Id.* at 71 line 22–73:18; 134:21–22.

54. *Id.* at 76:22–77:9.

55. *Id.* at 78:17–22.

56. Ward Dep. at 56:14–57:4; 66:22–67:1.

57. Woodruff Dep. at 93:13–21; Howell Dep. at 82:2–4.

58. Ward Dep. at 73:22–74:7.

59. McCray Dep. at 104:23–105:3; 169:9–17.

60. *Id.* at 105:6–9; 170:19–21.

61. *Id.*

62. Woodruff P.H.T. at 4.

63. *Id.*

64. McGraw Aff. at 2.

65. McCray Dep. at 173:8–11.

66. *Id.* at 105:11–14.

According to witness accounts, Carmichael and Carpenter were also standing near the booth and they threw McCray onto the floor.[67] During the ensuing struggle, the officers and McCray all ended up on the floor, and, in the process, broke some condiment bottles.[68] Woodruff and Carpenter held McCray's legs while Carmichael pinned him down with his forearms pressed to McCray's throat.[69] McCray testified that this choke hold was painful and made it difficult for him to breathe.[70] Although McCray admits that he attempted to force his head free so that he could breathe, he denies that he resisted Defendants' efforts to restrain him or did anything to defend himself.[71]

McCray was eventually forcibly removed from the restaurant with his hands handcuffed behind his back.[72] Stanford arrived shortly after McCray was brought out of the restaurant and indicated she could perform sign language interpretation.[73] The officers put McCray in a police car without permitting him to communicate with Stanford and took him to the police station.[74] Although an ambulance was called to attend the injuries of Woodruff, Ward admits he did not ask McCray if he was injured or have him examined by paramedics.[75] McCray's children, who witnessed the incident, were left by police in the restaurant with strangers.[76] When their mother arrived, she found them upset and crying.[77]

Woodruff claims that in the fracas, McCray shoved her backwards into a broken table which caused her to fall and to hit the back of her head on the salad bar.[78] McCray denies that he made any contact with Woodruff.[79] Woodruff was transported by ambulance to the hospital where she was treated for bruises and lacerations.[80] As a result of injuries which she sustained in the struggle, Woodruff missed the last two hours of her shift. She was also placed on light duty for ten days.[81]

The officers on the scene completed PD–12 reports, which are submitted to the police chief whenever force is used.[82] In those reports, each officer represented that McCray resisted them by fighting, kicking, or struggling violently.[83] None of them stated that McCray incited the struggle by pushing Woodruff.[84]

When McCray's wife arrived at the jail, she was not permitted to interpret for him.[85] McCray was, however, able to communicate to his wife and a jail employee

---

**67.** McGraw Aff. at 3.

**68.** McCray Dep. at 105:14–105:15; 175:11–13.

**69.** McCray Dep. at 105:20–21; 175:4–12.

**70.** *Id.* at 106:8–10; 175: 22–176:1.

**71.** *Id.* at 106.

**72.** *Id.* at 106:13–15; 106:23–107: 2.

**73.** Ward Dep. at 172:11–13.

**74.** Stanford Aff. at 44:13–21.

**75.** Ward Dep. at 136:13–15; 137:16–18; 138:14–23.

**76.** McGraw Aff. at 3.

**77.** Stanford Dep. at 43:10–12.

**78.** Woodruff P.H.T. at 4.

**79.** McCray Dep. at 174:14–175: 2.

**80.** Woodruff P.H.T. at 5.

**81.** *Id.*

**82.** Woodruff Dep. at 100:17–101:2.

**83.** Woodruff Dep.Ex. 7; Ward Dep.Ex. 4; Howell Dep.Ex. 4; Carmichael Dep.Ex. 12.

**84.** *Id.*

**85.** Stanford Dep. at 109:19–110:3.

that he was injured and wanted to be taken to the hospital.[86] The request for immediate medical attention was denied.[87] McCray was put in a jail cell.[88] He had blood on his clothing and was experiencing pain in his chest and in his throat.[89] When McCray's family was permitted to visit him, they also requested that jail personnel take him to the hospital.[90] However, they were told by jail personnel that he was not injured.[91]

Although McCray was eventually taken to the hospital for treatment, he could not communicate first because he was handcuffed and then because he was not permitted to have an interpreter.[92] McCray states that he eventually received only cursory medical attention from a physician.[93] Following his release from jail, McCray was found to have tenderness over his larynx, knee and wrist pain, and severe pain in both sides of his rib cage. X-rays showed a questionable rib fracture. A hand splint and pain medication were prescribed.

McCray remained in jail overnight and throughout the next day until he was taken to court. He was not released until his grandfather posted $10,000 in bail.[94] McCray was charged with two counts of second degree assault, resisting arrest, and obstructing government operations.[95] Although Carpenter completed all of the charges, including one for resisting arrest, he did not know what arrest McCray resisted.[96] All of the officers involved in the altercation testified either that they did not hear anyone tell McCray he was under arrest, or that they did not know when the arrest occurred. None of the officers involved in restraining McCray and effecting his arrest were certain about the basis for the obstruction charge. Robinson, a police department investigator, swore out the warrant for second degree assault based on Woodruff's report that she and Howell were injured by McCray while engaged in a lawful duty.[97] Robinson admitted that he did not independently examine the facts which Woodruff presented.[98] All of the charges were dismissed by a state court judge at a preliminary hearing for lack of probable cause.[99]

## IV. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate when "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In a case where the ultimate burden of persuasion at trial rests on the nonmovant, the movant can satisfy her initial burden either by submitting affirmative evidence negating an essential element of the nonmovant's claim or by demonstrating that the nonmovant's evidence itself is insufficient to establish an essential element of that claim. *Celotex Corp. v.*

---

86. *Id.*

87. McCray Dep. at 187:8–188:13.

88. *Id.* at 109:9–10; 190:23.

89. *Id.* at 193:3–9.

90. Stanford Dep. at 57:5–11.

91. *Id.*

92. McCray Dep. at 111:21–22.

93. *Id.* at 111:22–112:4.

94. *Id.* at 113:17–114:3; 204:3–5.

95. Woodruff Dep. at 141:20–142:2.

96. Carpenter Dep. at 31:6–15.

97. Deposition of Stacy Robinson ("Robinson Dep.") at 21:7–28:2.

98. *Id.* at 32:1–18.

99. Woodruff Dep. at 142:5–12

*Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

If this requirement is satisfied, the burden then shifts to the nonmovant to make a showing sufficient to establish the existence of an essential element to her claims, and on which she bears the burden of proof at trial. To satisfy this burden, the nonmovant cannot rest on her pleadings, but must, by affidavit or by other means, set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e).

The court's function in deciding a motion for summary judgment is to determine whether there exist genuine, material issues of fact to be tried; and if not, whether the movant is entitled to judgment as a matter of law. *See Dominick v. Dixie Nat'l Life Ins. Co.,* 809 F.2d 1559 (11th Cir.1987). It is substantive law that identifies those facts which are material on motions for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *De Long Equip. Co. v. Washington Mills Abrasive Co.,* 887 F.2d 1499 (11th Cir.1989).

When a court considers a motion for summary judgment, it is to refrain from deciding any material factual issues. All evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmovant. *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1080 (11th Cir.1990). The movant bears "the exacting burden of demonstrating that there is no dispute as to any material fact in the case." *Warrior Tombigbee Transp. Co. v. M/V/ Nan Fung,* 695 F.2d 1294, 1296 (11th Cir.1983); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

## V. DISCUSSION

### A. *Americans With Disabilities Act and Rehabilitation Act*

McCray contends that Defendants' failure to provide a sign language interpreter during McCray's police interrogation and subsequent to his arrest constitutes a violation of Title II of the Americans With Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act. In the alternative, McCray argues that he was arrested because he was deaf which constitutes discrimination under the Acts. The City argues that it is entitled to summary judgment on these claims because police interrogations during, or preceding, arrests are not programs or activities within the meaning of the ADA. The City further denies that it discriminated against McCray or otherwise failed to accommodate McCray's disability.

Title II of the ADA, on which McCray bases his claim, prohibits disability discrimination by public entities,[100] and states in pertinent part that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The Rehabilitation Act contains similar language regarding the rights of disabled persons to participate in federally-funded programs or activities. *See* 29 U.S.C. § 794(a).[101] These statutes require "public

---

**100.** The parties do not dispute that the City of Dothan is a public entity under the ADA and The Rehabilitation Act. It stands to reason that these claims are filed only against the City, and not against the officer defendants in their individual capacities.

**101.** "Section 504 of the Rehabilitation Act of 1973, 87 Stat. 394, as amended, 29 U.S.C. § 794(Act), prohibits a federally funded state program from discriminating against a handicapped individual solely by reason of his or her handicap." *School Bd. of Nassau County, Fla. v. Arline,* 480 U.S. 273, 275, 107 S.Ct.

entities to take appropriate steps to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with others." 28 C.F.R. § 35.160. For hearing impaired individuals, those steps include "appropriate auxiliary aids and services," including interpreters. 28 C.F.R. § 35.160(b).

■ To establish an ADA claim under Title II, McCray, a qualified disabled person,[102] must demonstrate either that he was "excluded from participation in or denied the benefits of services, programs, or activities of a public entity," or that he was otherwise "subjected to discrimination by any such entity." *Hainze v. Richards,* 207 F.3d 795, 799 (5th Cir.2000); *see also Kornblau v. Dade County,* 86 F.3d 193, 194 (11th Cir.1996) (plaintiff must allege 1) that he is a qualified disabled person, 2) that he was prevented from participating in a state program or activity, and 3) that the exclusion was based on his disability). The standard is the same whether a claim is sought under the ADA or the Rehabilitation Act. *See Harris v. Thigpen,* 941 F.2d 1495 (11th Cir.1991).[103]

McCray contends that, by failing to contact an interpreter before or after arresting him, Defendants discriminated against him in the provision of Dothan's services, programs or activities. "A program or activity" is defined as "all operations of a department, agency, ... or other instrumentality of a State." 29 U.S.C. § 794(b)(1)(A). The question thus becomes whether police investigatory questioning and arrest are programs or activities cognizable under the ADA or Rehabilitation Act. The issue is a matter of first impression in the Eleventh Circuit.

The Supreme Court has held that the ADA applies to prisons. *Pennsylvania Dept. of Corrections v. Yeskey,* 524 U.S. 206, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998). However, courts which have considered its applicability to investigative and arrest procedures have reached varying conclusions. For instance, in *Rosen v. Montgomery County, Maryland,* 121 F.3d 154 (4th Cir.1997), a hearing-impaired plaintiff was stopped for reckless driving and was arrested after failing field sobriety tests. *Id.* at 155–156. He alleged that police violated his rights under the ADA and Rehabilitation Act because they did not communicate with him in writing or obtain an interpreter for him as he requested. *Id.* at 156. The Court held that neither the field sobriety test nor the subsequent arrest was a program or activity within the meaning of the ADA. *Id.* at 157. More specifically, the Court's reasoning was as follows:

> Rosen was in no way "denied the benefits of" his arrest. As far as the police officers were concerned, Rosen ade-

---

1123, 94 L.Ed.2d 307 (1987). The City does not argue that it does not receive federal funds.

**102.** The ADA defines "qualified individual" as an "individual with a disability who, with or without reasonable accommodation to rules, policies, or practices ... or the provision of auxiliary aides and services, meets the essential eligibility requirements" for participation in programs or activities. 42 U.S.C. § 12131(2). The parties do not dispute that McCray was a qualified individual with a disability in that he is deaf and mute.

**103.** Since the ADA and Rehabilitation Act are materially similar, cases interpreting either are applicable and interchangeable for purposes of determining whether there has been a violation. *Allison v. Dept. of Corrections,* 94 F.3d 494, 497 (8th Cir.1996) ("Because the same basic standards and definitions are used under both Acts, cases interpreting either are applicable and interchangeable for purposes of our discussion.").

quately participated in the various tests for intoxication, and the officers obtained the information they needed to complete the booking process. Rosen was simply not "discriminated against" just because he could not follow everything the officers were telling him. If we assume, however, that the police were required to provide auxiliary aids at some point in the process, that point certainly cannot be placed before the arrival at the stationhouse. The police do not have to get an interpreter before they can stop and shackle a fleeing bank robber, and they do not have to do so to stop a suspected drunk driver, conduct a field sobriety test, and make an arrest. *Id.* at 158.

Plaintiffs assert that the Fourth Circuit's holding was based, in part, on the fact that Rosen was stopped and ultimately arrested for drunken driving, apparent unlawful activity which the police had an interest in stopping immediately. In other words, they argue that the exigent circumstances presented by Rosen's drunken driving should go toward the reasonableness of the accommodation rather than whether or not some accommodation need be made. In support of this conclusion, Plaintiffs point the court to the language of the Fifth Circuit's decision in *Hainze v. Richards,* 207 F.3d 795 (5th Cir.2000). In *Hainze,* a mentally ill plaintiff walking toward police officers with a knife was shot because he failed to comply with orders to stop. *Id.* at 797. The court held that "Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents . . . prior to the officer's securing the scene and ensuring that there is no threat to human life." *Id.* at 801. "Once the area was secure and there was no threat to human safety, the . . . deputies would have been under a duty to reasonably accommodate Hainze's disability in handling and transporting him to a mental health facility."

*Id.* at 802. The implicit conclusion to be drawn from this language coincides with Plaintiffs' assertion.

Similarly, the Eighth Circuit has held that police activity occurring post-arrest is a program, activity or service under the ADA. *See Gorman v. Bartch,* 152 F.3d 907, 912–13 (8th Cir.1998) (finding ADA claim viable where arrestee with disability was injured in a police vehicle during transport to police station because vehicle not equipped with wheelchair safety devices). The Tenth Circuit has also read the ADA definition of program or activity broadly to include police activity occurring prior to arrests and "investigations potentially involving arrests." *Gohier v. Enright,* 186 F.3d 1216, 1219 n. 2 (10th Cir.1999); *see also Calloway v. Boro of Glassboro Dept. of Police,* 89 F.Supp.2d 543, 555 (D.N.J. 2000) (relying on *Yeskey* to place stationhouse investigative questioning within the ambit of ADA activity).

The court is wary of further complicating matters for police officers in an already dangerous profession. *See e.g. Patrice v. Murphy,* 43 F.Supp.2d 1156, 1160 (W.D.Wash.1999) (observing that "forestalling all police activity until an interpreter can be located to aid communication with the deaf protagonist would be impractical and could jeopardize the police's ability to act in time to stop a fleeing suspect, physically control the situation, or interview witnesses on the scene"). On the other hand, the underlying policies of the ADA will be obviated if citizens who interact with police officers are mistreated solely on the basis of their disability. While it is by no means binding upon the court, the language of the Department of Justice website is instructive in seeking a balance between these competing concerns. *See* U.S. Dep't of Justice, *Commonly Asked Questions About the Americans With Disabilities Act and Law Enforcement, at*

<http://www.usdoj.gov/crt/ada/q & a—law. htm>.

Therein the question of whether or not police departments need to provide an interpreter for every deaf individual with which they interact is answered in the negative. *Id.* at 10. However, this answer is followed by the caveat that police officers "are required by the ADA to ensure effective communication with individuals who are deaf or hard of hearing." *Id.* Examples are then given when the requirement may be appropriate and when it is not, suggesting that the ADA's requirements turn merely upon the facts of a given situation. The inherent presumption, though, is that investigative activities are "activities" within the umbrella of ADA protections.

■ This reasoning persuades the court to adopt the rule announced by the Fifth Circuit in *Hainze.* In short, police activity is a government program under the ADA, but only when the circumstances surrounding the activity is "secure" and there is "no threat to human safety." *Hainze,* 207 F.3d at 802. The requirement that the area be secure provides police officers a bright line so that they need not endanger their lives or the lives of innocent citizens worrying whether the steps taken in hot pursuit of a suspect comply with the ADA. In other words, police investigative activities are government programs, but it is per se reasonable to disregard a suspect's disability until overriding concerns of public safety are ensured. At that time, the reasonableness of the accommodation required of the police officers is an issue of fact which will vary with regard to the nature of the activity in relation to the qualified individual's disability.

■ In the present matter, the facts taken in the light most favorable to

McCray demonstrate that he responded to written questions posed to him about a private property damage dispute to the extent he was capable of understanding them. Thereafter, he persistently requested that an interpreter be obtained to assist him in answering police investigatory questions. Defendants have presented no evidence suggesting McCray posed any "threat to human safety" which created a necessity for questioning him or arresting him prior to complying with his request for an interpreter. Indeed, Ward admitted that there was no exigent situation which required officers to hurry in gathering information for the property damage report.[104] Carpenter testified that there is no time limit on completing reports.[105] Thus, the court concludes that under these circumstances, the police defendants were under an obligation under the ADA to accommodate in effecting arrest activities.

■ The City argues that it is not liable because it reasonably accommodated McCray's disability by attempting to communicate with him through written notes. Whether an accommodation is reasonable "involves a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of the modification in light of the nature of the disability in question." *Staron v. McDonald's Corp.,* 51 F.3d 353, 356 (2nd Cir.1995). McCray has presented evidence that he is prelingually deaf and that he uses American Sign Language as his primary form of communication. McCray's expert testified that the meaning of words in ASL and English are not parallel. Therefore, his ability to understand English is limited in some respects. As a result, McCray argues that written communication in English was ineffective.

---

**104.** Ward Dep. at 85:22–23.

**105.** Carpenter Dep. at 58:14–19.

The ADA requires a public entity to "take appropriate steps" to ensure effective communications to include the use of "appropriate auxiliary aids or services." 28 C.F.R. § 35.160(b). The list of "auxiliary aids" includes "qualified interpreters." 28 C.F.R. § 35.104.2. In determining what type of auxiliary aid and service is necessary, a public entity "shall give primary consideration" to the requests of the individual with disabilities. 28 C.F.R. § 35.160(b)(2). Further, the Appendix to 28 C.F.R. § 35.160 states that "[t]he public entity shall honor the [disabled individual's] choice [of auxiliary aid] unless it can demonstrate another effective means of communications exists or that the use of the means chosen would not be required under § 35.164." McCray claims that the police refused ·his requests for an interpreter during their questioning and subsequent to his arrest. In light of McCray's inability to fully understand English, the appropriateness of the use of written notes as an auxiliary aid is a disputed issue of material fact which precludes summary judgment.

■ Alternatively, McCray asserts summary judgment is inappropriate on the wrongful arrest theory of the ADA, wherein the "police wrongly arrested someone with a disability because they misperceived the effects of that disability as criminal activity." *See Gohier* 186 F.3d at 1221. Taking the evidence in the light most favorable to McCray, Defendant Woodruff was investigating a civil property damage dispute. She was told that McCray was deaf and could not read lips. He answered written questions posed to him to the extent he understood them. McCray told Woodruff that he wanted an interpreter to assist him in answering questions. However, she perceived that McCray was refusing to cooperate with her efforts to obtain his name and address so that she could assist Hart and complete a property damage report. As a result, McCray was

physically assaulted by the police defendants, forcibly removed from the restaurant, and arrested. Assuming the truthfulness of those facts, McCray would not have been arrested if he had been able to hear. Where a plaintiff shows he was arrested because of his disability "and not because of the perpetration of some crime unrelated to his disability ... an ADA claim should lie." *Patrice*, 43 F.Supp.2d at 1159.

For instance, in *Lewis v. Truitt*, 960 F.Supp. 175, 178 (S.D.Ind.1997), the plaintiff was deaf. Although at least one of the police officers was advised the plaintiff was deaf when they arrived at his home to remove his granddaughter in a child custody matter, they did not attempt to communicate with him through the use of written questions. *Id.* When the plaintiff did not understand their verbal instructions, the police perceived the plaintiff was not being fully cooperative or otherwise being difficult. *Id.* at 176–77. As a result, they physically assaulted and arrested him. *Id.* The court held the defendants were not entitled to summary judgment because there was a genuine issue of material fact about whether defendants "knew [the plaintiff] was deaf but refused to take steps to communicate with him and then arrested with him because he did not respond to them appropriately." *Id.* at 178–79. The instant case presents an analogous fact situation to *Lewis* and summary judgment is inappropriate for the same reason.

### B. *Fourth Amendment– Unlawful Seizure*

#### 1. Police Defendants

The Fourth Amendment guarantees that all individuals will "be secure in their person ... against unreasonable seizures." U.S. Const. amend. IV. McCray alleges that the police defendants seized him in violation of the Fourth Amendment to the

extent they performed an investigative stop without the requisite reasonable suspicion, and to the extent that he was arrested without probable cause. *See United States v. Espinosa–Guerra,* 805 F.2d 1502, 1506 (11th Cir.1986) (identifying investigative stops and full scale arrests among tiers of police-citizen encounters which implicate the Fourth Amendment); *Brower v. County of Inyo,* 489 U.S. 593, 595, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989) (Fourth Amendment seizure is effected "when there is a governmental termination of freedom of movement through means intentionally applied").[106] In response to these claims, the police defendants have raised the defense of qualified immunity.[107] However, as an initial matter, the court must determine whether the defendants' actions violated McCray's Fourth Amendment rights. *See Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) ("A court evaluating a claim of qualified immunity must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation.")

Defendants concede that McCray was seized at some point during his pre-arrest encounter with police because he did not satisfactorily answer Woodruff's questions or accompany police officers outside to complete a property damage report. McCray admits that he did not provide the officers with his driver's license and that he did not accompany them outside while he was awaiting the arrival of his interpreter. However, he contends that because Woodruff and other officers approached him about a civil property damage dispute, they had no legal authority to require him to answer any question or to forcibly remove him from the restaurant. In opposition, the police defendants argue they had a reasonable suspicion that McCray had committed the criminal offense of failing to give information or render aid after a traffic accident under ALA.CODE § 32–10–2[108] or failing to notify the owner upon striking an unattend-

**106.** McCray brings the Fourth Amendment claim and others alleging violations of his constitutional rights through § 1983. A § 1983 claim requires that a plaintiff show "conduct complained of was committed by a person"; that the person was "acting under color of state law"; and that "this conduct deprived [the plaintiff] of rights, privileges or immunities secured by the Constitution or laws of the United States." *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). Since McCray has sued police officers and a municipality, the parties do not dispute that McCray's allegations are made against persons who acted under color of law. Therefore, the court will limit its discussion to the element actually in dispute—whether McCray has shown that his constitutional rights were violated.

**107.** The court agrees with the contention of the police defendants that Defendant Officer Robinson is entitled to summary judgment on the Fourth Amendment claim since he did not participate in the arrest or assault.

**108.** The offense described in § 32–10–2 is, according to the statutory title, "Duty to give information and render aid." That section provides:

> The driver of any motor vehicle involved in an accident resulting in injury to or the death of any person or damage to any vehicle which is driven or attended by any person shall give his name, address and the registration number of the vehicle he is driving, shall upon request exhibit his driver's license to the person struck or the driver or occupant of or person attending any motor or other vehicle collided with or damaged and shall render to any person injured in such accident reasonable assistance, including the transportation of, or the making of arrangements for the transportation of such person to a physician or hospital for medical or surgical treatment, if it is apparent that such treatment is necessary or if such transportation is requested by the injured person.

ed vehicle under ALA.CODE § 32–10–3.[109] Therefore, they argue that they had authority to approach McCray to obtain his name and address and to use some amount of non-excessive force in removing him from the building pursuant to ALA. CODE § 15–5–30 [110] and *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Both § 15–5–30 and *Terry* permit a police officer to constitutionally detain an individual for brief periods of questioning based on an objectively reasonable suspicion that an individual is involved in criminal activity. For the reasons which follow, the court concludes that the police defendants' arguments are unavailing.

It does not appear there was any traffic accident or collision which would have implicated McCray's duty as a driver,[111] as contemplated by either § 32–10–2 or § 32–10–3. Those sections describe offenses which concern leaving the scene of a traffic accident before rendering aid or providing certain information. *See Ex parte Mayfield,* 545 So.2d 92, 93 (Ala.1988) (holding that "the purpose of the 'leaving-the-scene' statute is to impose 'multiple duties upon the driver of a motor vehicle involved in an accident resulting in personal injury or in property damage to another vehicle that is driven or attended by any person' ").

Taking the facts in the light most favorable to McCray as true, Woodruff was dispatched to intervene in what she initially described as "a private property traffic incident." When she arrived at Quincy's, Hart described to her damage which a child passenger exiting McCray's parked automobile had caused to Hart's parked automobile. Although McCray had been driving the automobile from which the child exited, he was in no way implicated in the damage caused to Hart's car.[112] There is no evidence he even knew about the damage before Hart and Woodruff attempted to bring it to his attention. Indeed, Woodruff has admitted that the sequence of events which Hart alleged did not constitute a traffic accident.

Additionally, Woodruff testified that when she first approached McCray she had no indication that McCray had been involved in any criminal activity.[113] Rather, she testified that she was merely at-

---

**109.** Section 32–10–3 describes a driver's "[d]uty upon striking unattended vehicle" as follows:

> The driver of any motor vehicle which collides with any motor vehicle or other vehicle which is unattended shall immediately stop and shall then and there either locate and notify the operator or owner of such vehicle of the name and address of the driver and owner of the vehicle striking the unattended vehicle or shall leave in a conspicuous place in or on the vehicle struck a written notice giving the name and address of the driver and/or the owner of the vehicle doing the striking and a statement of the circumstances thereof.

**110.** Under § 15–5–30, an officer has authority to stop and question an individual where there is reasonable suspicion, based on the totality of the circumstances, that he is involved in criminal activity. *Crawley v. State,* 440 So.2d 1148, 1150 (Ala.Crim.App.1983). That authority is described as follows:

> A sheriff or other officer acting as sheriff, his deputy or any constable, acting within their respective counties, any marshal, deputy marshal or policeman of any incorporated city or town within the limits of the county or any highway patrolman or state trooper may stop any person abroad in a public place whom he reasonably suspects is committing, has committed or is about to commit a felony or other public offense and may demand of him his name, address and an explanation of his actions.

ALA.CODE § 15–5–30.

**111.** A driver is defined as "every person who drives or is in actual physical control of a vehicle." ALA.CODE § 32–1–1.1(14).

**112.** Woodruff Dep. at 87:15–20.

**113.** *Id.* at 48:7–16; 42:18–43:1.

tempting to obtain McCray's name and address for Hart in furtherance of his civil claim for property damage.[114] If Woodruff and other police officers did not approach McCray and question him due to any reasonable suspicion that he was involved in criminal activity, neither *Terry* nor Alabama Code § 15-3-30 made it constitutionally permissible for them to subject him to any unwanted questioning or to otherwise restrain his liberty.

■ "Of course, police officers are free to approach a citizen on the street and ask if he is willing to answer a few questions. But absent reasonable suspicion justifying a *Terry* investigative stop, the citizen is free to refuse to answer questions and walk away." *U.S. v. Gray,* 213 F.3d 998, 1000 (8th Cir.2000); *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) ("law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen"). Reasonable suspicion requires, considering the totality of the circumstances, "some minimum level of objective justification." *Gainor v. Douglas County, Georgia,* 59 F.Supp.2d 1259, 1274 (N.D.Ga.1998) (quoting *United States v. Sokolow,* 490 U.S. 1, 4, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)). Defendants have not presented any evidence that such objective justification existed at the time Woodruff approached McCray or at any time thereafter.

Although she admits she had none initially, Woodruff contends that she later developed a reasonable suspicion when McCray refused to answer her questions which, she argues, justified the attempts of police defendants to forcibly remove him from the restaurant.[115] That contention must also fail. First, it is not evident that McCray refused to answer any question Woodruff put to him. He responded to her written questions about whether he owned the green car which Hart claimed was involved in the property damage dispute and, in response to further verbal and written questions, McCray persistently requested that an interpreter be obtained to assist him. Second, even if McCray had refused to answer Woodruff's questions, absent other specific and articulable facts, McCray's refusal to cooperate with the questioning could not itself supply the reasonable suspicion that he was engaged in criminal activity. As the Supreme Court has explained: "an individual may decline an officer's request without fearing prosecution. We have consistently held that refusal to cooperate, without more, does not furnish the minimum level of objective justification needed for a detention or seizure." *Florida v. Bostick,* 501 U.S. 429, 436, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); *see also Florida v. Royer,* 460 U.S. at 498, 103 S.Ct. 1319 (holding that a person "may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds").

■ The refusal to cooperate with a police officer may not serve as a basis for reasonable suspicion unless it is accompa-

114. *Id.*

115. *Id.* at 108:7–20. In her brief, Woodruff evades discussion of her deposition admissions, arguing that the circumstances objectively justified a seizure solely because McCray violated the "duty to report" statutes. The truth of such factual assertion is irrele-vant absent "articulable suspicion" at the time of the incident. Furthermore, as McCray was merely waiting for his interpreter to arrive, there is no basis upon which to reasonably suspect that he was planning to violate such statutes, assuming it applied to him.

nied by "nervous, evasive behavior." *Illinois v. Wardlow,* 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). Beyond the communication gap between a deaf man and herself, Woodruff has not articulated *any* specific facts upon which suspicion reasonably could be founded. Any "evasive" behavior on the part of McCray was justified by his belief that he was entitled to wait for his interpreter. Inasmuch as this belief was communicated to Woodruff, there is no basis upon which she reasonably could have suspected McCray of any wrongdoing. Therefore, a *Terry* justification for Woodruff's investigatory stop is foreclosed. As such, summary judgment should be denied with respect to McCray's claim against Woodruff and Howell.

■ The remaining officer defendants allege that they lawfully arrested McCray for pushing Woodruff and assaulting Howell when the officers grabbed his arms to pull him from his seat. That argument is not well-taken because McCray disputes that he pushed Woodruff. McCray has also presented evidence in the form of witness affidavits which, if accepted as true, demonstrate that he did not in any way assault the police defendants or otherwise act to defend himself. Likewise, there is no evidence that McCray committed the crime of obstructing government operations insofar as the officers were not performing any legitimate operations.[116] The record indicates that the remaining officers were outside when the fracas between McCray, Woodruff and Howell

arose, so there is some question as to whether they truly could have had probable cause as to an incident they did not clearly observe.[117] Thus, the evidence before the court raises a genuine issue of material fact as to whether any of the officer defendants had sufficient justification under the Fourth Amendment to stop and then to arrest McCray.

■ Because the stop and arrest were unlawful, McCray argues that any force used by the police defendants was excessive. "Under this Circuit's law, however, a claim that any force in an illegal stop or arrest is excessive is subsumed in the illegal stop or arrest claim and is not a discrete excessive force claim." *Jackson v. Sauls,* 206 F.3d 1156, 1171 (11th Cir.2000) (citing *Williamson v. Mills,* 65 F.3d 155, 158–59 (11th Cir.1995)). Therefore, the court need not evaluate excessive force as a separate claim. *Jackson,* 206 F.3d at 1171; *see also Motes v. Myers,* 810 F.2d 1055, 1059 (11th Cir.1987) ("It is obvious that if the jury finds the arrest unconstitutional, the use of force and the search were unconstitutional and they become elements of the damages for the § 1983 violation."). The court will, instead, proceed to the question of whether the police defendants are entitled to qualified immunity for the constitutional violations posed by the unlawful stop and arrest.

In the Eleventh Circuit, a two-pronged analysis applies in resolving the qualified immunity issue. As a threshold matter, the defendant government official must

---

116. Under Alabama law, the crime of obstructing government operations requires interference by "intimidation, physical force, or by any other independently unlawful act." ALA.CODE § 13A–10–2.

117. Indeed, when filing their reports asserting that McCray had resisted arrest, none of the police defendants listed the basis of the arrest that McCray allegedly resisted. This

calls into question the basis upon which they founded their authority for the arrest insofar as probable cause requires reference to "facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information." *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925). At a minimum, a genuine issue of material fact has been raised.

prove that he was acting within his discretionary authority when the alleged constitutional violation occurred. *Rich v. Dollar,* 841 F.2d 1558, 1563 (11th Cir.1988). A government official acts within his discretionary authority if challenged actions "were undertaken pursuant to the performance of his duties and within the scope of his authority." *Sims v. Forehand,* 112 F.Supp.2d 1260, 1267 (M.D.Ala.2000). Here, there is no dispute that the police defendants were acting within their discretionary authority at the time the alleged constitutional violations occurred. *See, e.g., Ferguson v. City of Montgomery,* 969 F.Supp. 674, 678–79 (M.D.Ala.1997) (finding that the determination that an officer was acting within his or her discretionary authority is a "low hurdle" to clear).

The second step in determining whether police defendants' actions are protected by qualified immunity is to ascertain whether their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Nolin v. Isbell,* 207 F.3d 1253, 1255 (11th Cir.2000). To be clearly established, the "contours" of an asserted constitutional right "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In addition, "pre-existing law must dictate, that is truly compel (not just suggest or allow or raise a question about) the conclusion for every like situated reasonable government agent that what [the] defendant is doing violates federal law in the circumstances." *Lassiter v. Alabama A & M University,* 28 F.3d 1146, 1150 (11th Cir. 1994) (en banc). As the Eleventh Circuit has noted:

> When considering whether the law applicable to certain facts is clearly established, the facts of the cases relied on as precedent are important. The facts need not be the same as the facts of the

immediate case. But they need to be materially similar. Public officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases.

*Adams v. St. Lucie County Sheriff's Dept.,* 962 F.2d 1563, 1575 (11th Cir.1992).

■ The police defendants purportedly based their actions upon reasonable suspicion. In the context of "qualified immunity, the issue is not whether reasonable suspicion existed in fact, but whether the officer had 'arguable' reasonable suspicion to support an investigatory stop." *Jackson,* 206 F.3d at 1166; *Lindsey v. Storey,* 936 F.2d 554, 559 (11th Cir.1991) ("it is inevitable that law enforcement officers will sometimes reasonably but mistakenly conclude that reasonable suspicion is present, and these officers are protected by qualified immunity").

If McCray's version of events is credited, as it must be at this stage of the litigation, on the whole, the facts known by the police defendants at the time they stopped McCray were insufficient to meet even this burden. As stated above, at the time Woodruff approached McCray, she attempted to question him about an incident concerning damage to private property. By her own admission, no criminal activity was suspected. Therefore, McCray was not obligated to answer any question. Even if at some point McCray refused to answer questions regarding the civil property damage dispute pending the arrival of his interpreter, there is no evidence that he did anything sufficient to create an arguable reasonable suspicion of criminal activity. The Supreme Court has repeatedly held that the mere refusal to answer the questions of a police officer may not serve as the basis for a seizure under the Fourth Amendment. *Bostick,* 501 U.S. at 436, 111 S.Ct. 2382 (holding that a citizen need not answer questions

put forth by an officer, and such refusal does not furnish grounds for seizure). Therefore, the police defendants are not protected by qualified immunity from civil liability arising from the investigatory stop.

The police defendants also argue they are entitled to qualified immunity for the subsequent arrest of McCray. "It is clearly established that an arrest made without probable cause violates the Fourth Amendment." *Thornton v. City of Macon*, 132 F.3d 1395, 1399 (11th Cir.1998). The defense of qualified immunity protects the police defendants from liability if there was "arguable probable cause" to arrest McCray. *Montoute v. Carr*, 114 F.3d 181, 184 (11th Cir.1997). In other words, "the facts and circumstances must be such that the officer reasonably could have believed that probable cause existed." *Id.* This is established upon a determination that reasonable officers in the same circumstances and possessing the same knowledge as the police defendants could have believed that probable cause existed to arrest Plaintiff. *Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir.1990).

McCray was arrested for obstruction of government operations, resisting arrest, and assault. Under Alabama law, the crime of obstructing government operations requires interference by "intimidation, physical force, or by any other independently unlawful act." ALA.CODE § 13A-10-2. Accepting McCray's version of events as true, he was eating in a restaurant without incident or disturbance until Woodruff approached him with questions about the damage to Hart's car. After that, he answered her questions to the extent he was able without the benefit of an interpreter. Woodruff and Howell attempted to persuade McCray to leave the restaurant to answer questions about the damage to Hart's car by twice touching McCray's elbow. According to Woodruff,

McCray was not then under arrest. As a result of their pulling on his arms, McCray came out of his seat. Insofar as the officers had no legal authority upon which to compel McCray to leave the restaurant, the court finds that a reasonable officer could not have believed that probable cause existed to arrest McCray for obstructing government operations. *See, e.g., Thornton v. City of Macon*, 132 F.3d 1395, 1399 (11th Cir.1998) (holding that "no reasonable police officer would have believed that the officers had probable cause to arrest [the plaintiff] for obstruction of such unauthorized actions"); *Houston v. Tucker*, 137 F.Supp.2d 1326, 1337 (N.D.Ga.2000) ("[W]hen officers forcibly try to resolve disputes, while not engaged in the lawful discharge of their official duties, they lack probable cause to arrest for obstruction of their unauthorized actions."). As such, the court finds that Woodruff and Howell are not protected by qualified immunity, so summary judgment should be denied.

■ The same cannot be said for Ward, Carmichael, and Carpenter. These officer defendants were outside when Woodruff and Howell initiated the unlawful contact with McCray. Even viewing the facts in the light most favorable to McCray, there is no doubt that, after McCray's arm was pulled and he left the booth, a violent struggle ensued. Carmichael and Carpenter then proceeded to enter the restaurant to provide assistance for Woodruff and Howell. They perceived a struggle which they mistakenly, but reasonably interpreted as resistance to an arrest. It is immaterial that they could not specifically point to a crime which McCray might have committed. *See Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) ("Even law enforcement officers who reasonably but mistakenly conclude that probable

cause is present are entitled to qualified immunity."). The court refuses to sanction police officers who unwittingly aid their fellow officers in effectuating an unlawful arrest so long as the unlawfulness of the arrest was not patently obvious. *See Malley v. Briggs,* 475 U.S. 335, 343, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (holding that qualified immunity shields "all but the plainly incompetent or those who knowingly violate the law"). There being grounds to believe that a reasonable officer could believe that assistance was needed, the court grants summary judgment to police defendants Ward, Carmichael and Carpenter on the grounds of qualified immunity.[118]

## 2. Municipal Liability

Employing the "practice or custom" approach, McCray argues that the City is also liable under the Fourth Amendment for his unlawful seizure at the hands of the police defendants. McCray has presented undisputed evidence that the Dothan City Commission is the policymaker for the City's police department. "[R]ecovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality'—that is, acts which the municipality has officially sanctioned or ordered." *Pembaur v. Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (holding municipalities are "persons" for purposes of § 1983 and can be liable where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers").

In some instances, a municipality may be subject to § 1983 liability for "constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell,* 436 U.S. at 690–91, 98 S.Ct. 2018. Such liability requires that Plaintiff provide evidence that establishes "a widespread practice that, 'although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law.'" *St. Louis v. Praprotnik,* 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (quoting *Adickes,* 398 U.S. at 167–68, 90 S.Ct. 1598). Stated differently, "a longstanding and widespread practice is deemed authorized by the policymaking officials because they must have known about it but failed to stop it." *Brown v. City of Fort Lauderdale,* 923 F.2d 1474, 1481 (11th Cir.1991); *see also Brooks v. Scheib,* 813 F.2d 1191, 1193 (11th Cir.1987) ("A municipality's failure to correct the constitutionally offensive actions of its police department may rise to the level of a 'custom or policy' if the municipality tacitly authorizes these actions or displays deliberate indifference towards the police misconduct.") (citations omitted).

McCray has presented evidence that the City was aware of numerous unlawful seizure and excessive force claims filed by citizens against Dothan police officers. McCray also shows that the system through which the City investigates alleged deviations from the department policies depends almost completely upon self-reporting by the officers involved in the suspect conduct. However, there is no

---

**118.** No evidence has been offered to suggest that Ward ever seized McCray. Moreover, since his judgments were based upon the information relayed to him by Woodruff and his perceptions from outside the restaurant, the court finds that he is shielded from qualified immunity, even in the face of a theory that he might have authorized an unlawful seizure.

provision in the reporting policy which requires officers to report misconduct of other officers. In addition, McCray has adduced evidence that there is also no provision for protecting the anonymity of officers who report abuses of authority. According to McCray, this explains why, out of twenty-nine excessive force complaints since 1988, only one was found to have merit.[119] The remaining complaints were either dismissed, exonerated or designated "no status." [120]

The Eleventh Circuit has established that "a persistent failure to take disciplinary action against officers can give rise to the inference that a municipality has ratified conduct, thereby establishing a 'custom' within the meaning of *Monell.*" *Fundiller v. City of Cooper City,* 777 F.2d 1436, 1443 (11th Cir.1985). To be sure, "the number of complaints bears no relation to their validity." *Brooks,* 813 F.2d at 1193. However, McCray also shows that the complaints which he made against Dothan police were not fully investigated, if they were investigated at all.[121] No disinterested witnesses were interviewed and the police chief did not question the police officers' unanimous version of events. The City has not disputed that evidence. Additionally, while John White, the police chief, testified the use of force in this case was consistent with department policy, White conceded that the City has never adopted a formal policy on the use of force. "The continued failure of the city to prevent known constitutional violations by its police force is precisely the type of informal policy or custom that is actionable under section 1983." *Depew v. City of St. Marys, Georgia,* 787 F.2d 1496, 1499 (11th Cir. 1986).[122] At the very least, such evidence is enough to withstand a motion for summary judgment in the Eleventh Circuit.[123]

Under a second theory of liability, McCray further asserts that the City's failure to adequately train its police officers caused the Fourth Amendment violations at issue. "To establish municipal liability under *Canton, Ohio v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), Plaintiff must establish two things: first, that the city in fact inadequately trained its employees in the lawful execution of their duties, and second, that this failure to train was actually a city policy." *Kerr v. City of West Palm Beach,* 875 F.2d 1546, 1555 (11th Cir.1989) (citations omitted). "[O]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is action-

---

**119.** *See* Allen Aff.

**120.** *Id.*

**121.** Woodruff Dep. at 153:18–19; Ward Dep. at 185:6–18.

**122.** For instance, in *Depew,* the city was aware of approximately five prior incidents where police had used excessive force, but nevertheless failed to take remedial action. 787 F.2d at 1499. Because "the city had knowledge of improper police conduct, but failed to take proper remedial action," *Id.,* the court held that a jury could legitimately infer that the city "had implicitly ratified a custom or policy permitting the police to use excessive force against its citizens." *Id.* at 1501.

**123.** Consider, for instance, the case of *Samples v. City of Atlanta,* wherein summary judgment was deemed improper on an excessive force claim against the City where the plaintiffs demonstrated: (1) that "an extremely low percentage" of claims filed against police officers have been sustained by the force, and that the rate was particularly low with respect to claims involving police brutality; (2) that in the police-run investigation of the plaintiffs' shooting, not all of the questions the investigators had were answered; (3) that, in an affidavit, police official advocated shoot-to-kill mentality among police officers. 846 F.2d 1328, 1333 (11th Cir.1988)

able under § 1983." *Id.* "Before it may be said that a municipality has made a deliberate choice among alternative courses of action, its policymakers must have had 'actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens.'" *Young v. City of Augusta*, 59 F.3d 1160, 1172 (11th Cir. 1995).

 McCray argues that the City had either actual or constructive knowledge of the need to train its police officers concerning the appropriate standards for the seizure of an individual the use of force in making the arrest. In support of the failure to train argument, McCray shows that both Ward and Howell testified that they had not received any training on constitutional rights since they left the police academy. White testified that the City has adopted no policy governing the use of force. McCray also asserts that the numerous complaints against the police department which alleged unlawful seizure or excessive force should have put the City on notice that the need to train on Fourth Amendment issues was "patently obvious." *See Young v. City of Augusta*, 59 F.3d at 1172 ("[T]he need for more or better training may be obvious where a pattern of constitutional violations exists such that the municipality knows or should know that corrective measures are needed."). As the Eleventh Circuit has observed, "the frequency of constitutional violations may, in itself, provide sufficient circumstantial evidence that a municipality has chosen to allow its officers to act without adequate training." *Kerr*, 875 F.2d at 1556. Furthermore, this is not the first case filed against the City alleging such claims, so it can hardly pretend that McCray's assertion comes as a surprise. *See Sumlar v. City of Dothan*, No. 00–D–717–S (M.D.Ala. filed June 2, 2000); *Bivins v. City of Do-*

*than*, No. 99–D–397–S (M.D.Ala. filed April 21, 1999). The court thus agrees that the City had notice of the need to train.

The relevant question thus becomes whether proof of causation is present. The test for causation turns on a finding that "but for the deficient training program the constitutional violation would not have occurred." *Gainor v. Douglas County, Georgia*, 59 F.Supp.2d 1259, 1295 (N.D.Ga.1998) (citing *Canton*, 489 U.S. at 391, 109 S.Ct. 1197). To establish causation, "a plaintiff must ... demonstrate a direct causal link between the municipal action and the deprivation of federal rights," *Board of County Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997), "such as to make the specific violation almost bound to happen, sooner or later, rather than merely likely to happen in the long run." *Spell v. McDaniel*, 824 F.2d 1380, 1389–91 (4th Cir.1987); *cf. Canton*, 489 U.S. at 391, 109 S.Ct. 1197 ("[T]he identified deficiency ... must be closely related to the ultimate injury.").

 The evidence which McCray has adduced supports a reasonable inference his injuries would not have occurred had there been a City policy on the use of force, or at least a provision for mandating that police officers report misconduct. Taking the evidence in the light most favorable to McCray, the police used force to arrest McCray in a situation where no arrest and, indeed, no force whatsoever was authorized. The self-reports prepared by the police officers involved in the arrest stated that McCray resisted arrest so that the use of force was justified. To the extent those reports allege McCray resisted arrest, they conflict with McCray's statement and the statements of disinterested witnesses.[124] The City's self-report-

---

**124.** *See* Affidavits of Amy McGraw and Michael D. McGraw.

ing policy created no incentive for police officers to make truthful reports in circumstances such as this one where use of force was unwarranted. The evidence also suggested that White simply "rubber stamped" the cursory investigation of this and other incidents of alleged police misconduct. Therefore, the court concludes that the City is not entitled to summary judgment on McCray's Fourth Amendment claims.

### C. *Equal Protection—Disability*

■ McCray alleges that Defendants' conduct toward him, including the alleged arrest, battery, prosecution, and general harassment, was motivated by his deafness, thereby violating his right to equal protection under the law. The Equal Protection Clause of the Fourteenth Amendment forbids any state to "deny to any person within its jurisdiction the equal protection of the law." U.S. CONST. amend. XIV. Accordingly, the Equal Protection Clause requires that similarly situated persons should be treated in a like manner. *Spence v. Zimmerman*, 873 F.2d 256, 258 (11th Cir.1989). Although the equal protection clause purports to prevent state actors from treating people differently on the basis of disability, disabled persons do not constitute a suspect class. *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 451, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Since discrimination based on disability does not involve a suspect or quasi-suspect class and no fundamental right is involved, to show a violation of equal protection rights McCray must first show that he was treated differently than others similarly situated to him. *E & T Realty v. Strickland*, 830 F.2d 1107, 1109 (11th Cir.1987), *cert. denied*, 485 U.S. 961, 108 S.Ct. 1225, 99 L.Ed.2d 425 (1988).

"Equal protection does not exist in a vacuum; '[t]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same.' " *Pollard v. City of Chicago*, 643 F.Supp. 1244, 1252 (N.D.Ill.1986) (quoting *Tigner v. Texas*, 310 U.S. 141, 145, 60 S.Ct. 879, 84 L.Ed. 1124 (1940)). If that requirement is met, McCray must next prove Defendants intentionally discriminated against him without rational basis for doing so. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (stating that Supreme Court has recognized "successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment").

■ Thus, in an eventual trial, the burden would be upon McCray to prove 1) that he was intentionally treated differently from non-deaf individuals because he was deaf, and 2) that there was no rational basis for having been treated as such. The *Celotex* Court held that, when the nonmoving party bears the burden of persuasion at trial, a party moving for summary judgment will satisfy its burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. Of course, before the burden of persuasion shifts in this regard, this demonstration must make some reference to "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any." *Id.* at 323, 106 S.Ct. 2548. In other words, as is the rule in the Eleventh Circuit, "[e]ven after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial." *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991).

Defendants have argued that there is absolutely no proof anywhere in the record to support an inference that the officers'

alleged mistreatment of McCray was in any way related to his hearing impairment. McCray has asked the court to apply a harsh literal interpretation of the *Clark* rule insofar as the City has not pointed to anything specific in the record to support a finding of summary judgment. The court refuses to require that movants in such circumstances undertake the formidable task of proving a negative. It would be a strange rule to allow courts to grant summary judgment *sua sponte* upon the losing party's presentation of the evidence, yet deny a moving party the same simply for inadequacy in proving a negative. *Celotex,* 477 U.S. at 326, 106 S.Ct. 2548. Accordingly, the court finds that Defendants properly shifted the burden to McCray when they recited facts from the record, asserting that those facts were insufficient to infer evidence of an equal protection violation. *See Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115–16 (11th Cir.1993) (holding that in such instances, movant needs merely to "point out to the district court" the absence of evidence supporting non-movant's case).

McCray points to the frustration that developed on the part of the officers as a result of dealing with him, but he has provided no indication that this frustration was in any way the source of intentional discrimination. In fact, McCray has provided ample evidence alleging that Dothan police officers act aggressively toward many of its citizens, regardless of their hearing capabilities. While the City may have failed to adequately train its officers to appropriately interact with deaf citizens, McCray has neither indicated that this failure is irrational nor whether it is the result of intentional discrimination toward the hearing impaired. Therefore, the court finds there to be no issue of fact with respect to McCray's equal protection claim as to disability, so summary judgment on this ground is granted.

## D. *Equal Protection—Race*

As with the issue of disability, Defendants assert that there is nothing in the record to support a finding that Defendants intentionally discriminated against McCray on the basis of his race. Once again McCray counters that such blanket assertions are insufficient to shift the burden of proof under *Celotex.* Even when the issue concerns the alleged denial of equal protection under the laws with regard to a suspect class, of which McCray as an African–American is indisputably a member, the initial burden to establish a prima facie case is still on the plaintiff. *Personnel Adm'r of Mass. v. Feeney,* 442 U.S. 256, 272, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). Thus, the court finds that, under *Celotex,* Defendants have sufficiently shifted the burden of persuasion to McCray by insisting that the record is insufficient to demonstrate that the incident in the restaurant would not have happened were McCray not a member of a suspect class. *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548; *Fitzpatrick,* 2 F.3d at 1115–16.

The essence of the Equal Protection Clause is "the prevention of official conduct discriminating on the basis of race." *Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). There is no question that law enforcement officers perform the type of official conduct contemplated by the Equal Protection Clause, and, indeed, McCray has the right not to be the target of a police investigation solely on the basis of skin color. *Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). In order to demonstrate that this right was violated, McCray must prove that Defendants' actions had a discriminatory effect upon him and that they were motivated by a discriminatory purpose. *Feeney,* 442 U.S. at 272–74, 99 S.Ct. 2282.

Discriminatory effect is established upon demonstration that similarly situated individuals who were not members of a protected class were treated differently than McCray. *See, e.g., United States v. Armstrong,* 517 U.S. 456, 465, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996). This effect can be shown upon comparison of one individual or by use of statistics which generally give rise to the conclusion that police practices have a discriminatory effect upon African–Americans in comparison with similarly situated Whites. *Id.* at 467–69, 116 S.Ct. 1480. It must be noted, however, that the burden upon McCray is especially high in the latter instance. *See, e.g., Chavez v. Illinois State Police,* 251 F.3d 612, 640 (7th Cir.2001) ("While it is true that statistics alone rarely state a violation of equal protection ... they can be sufficient to establish discriminatory effect.").

McCray first asserts that Woodruff accosted him and suspected him of wrongdoing, whereas she acted in a polite manner toward Hart, the White owner of the Corvette. The thrust of this argument is that police interaction with two individuals of a different race was different in tone. There are significant problems in using these two individuals as exemplars of the "similarly situated." Unlike legislation found to be violative of equal protection, police investigation is more nuanced and fact specific, not to mention inherently protean and metamorphic. For instance, Hart and McCray were similarly situated in that they were both parties to the property damage, but since McCray's daughter was at fault, the texture of Woodruff's questioning necessarily would differ as to the two parties. McCray's deafness underscored the need for Woodruff to treat the parties differently, and this disparity was furthered by his insistence that questioning cease until an interpreter arrive. McCray has failed to establish exactly at which point he and Hart were similarly situated, if at all.

This is not to say that McCray must overcome the insurmountable burden of finding an occasion in which Woodruff questioned a White deaf man involved in an automobile incident. However he must provide some facts to suggest that the incident at the restaurant was instigated solely on the basis of his race. *See Williams v. Bramer,* 180 F.3d 699, 706 (5th Cir.1999) (holding that officer's use of racial epithet in effecting arrest will not, by itself, constitute equal protection violation). For present purposes, it is enough to say that the court finds that a difference in an officer's gentility when questioning two parties putting up varying degrees of resistance is insufficient to establish discriminatory effect.[125]

McCray also provides evidence asserting that, even though less than one-third of Dothan's population is African–American, they are the subjects of more than two-thirds of the Terry stops performed by the Dothan police force.[126] Furthermore, thirteen percent of those African–Americans stopped were done so for little reason beyond walking or simply driving around.[127] Whatever this pattern suggests about the police force as a whole, it fails to impute any discriminatory effect from the general practices of any of the officer defendants.

---

**125.** Since the remainder of the incidents at the restaurant follow from the initial conversation, Hart is obviously not the appropriate model for purposes of finding a similarly situated individual with regard to the equal protection claims against the police defendants who arrived later.

**126.** The exacts numbers according to McCray's evidentiary supports are 30.11% with regard to the citizenry (Loftin Aff.), and 69.5% with regard to the Terry stops. (Allen Decl. ¶ 1.)

**127.** Allen Decl. ¶ 2.

Consequently, the court summarily grants each individual police defendant summary judgment on the equal protection claim.[128]

Such a disparate impact upon a protected class can, however, raise questions with regard to whether or not there was a municipal policy to harass African–Americans, and thus whether the City can be held liable. *See, e.g., Brown v. City of Ft. Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991) (observing that widespread violation of constitutional rights by municipal employees can give rise to an inference of municipal policy). As compelling as the statistical disparities may be with regard to the *Terry* stops, there is still a question as to whether this alone is sufficient to establish discriminatory effect.

In *Armstrong*, a case alleging the selective prosecution of criminal claims with regard to African–Americans, the Court held that a statistical comparison was insufficient to demonstrate discriminatory effect insofar as it failed to analyze the racial disparity in the cases that prosecutors chose *not* to pursue. *Armstrong*, 517 U.S. at 470, 116 S.Ct. 1480. The court finds that no such burden need be imposed upon McCray in the present instance insofar as it would be impossible to determine the races of the individuals that Dothan police officers chose not to investigate. *See, e.g., Chavez*, 251 F.3d at 640. The court is not prepared to conclude, however, that, without more, such a statistical anomaly is sufficient as a matter of law to establish that African–Americans in Dothan are treated differently from similarly situated White citizens. However, given the broad disparity between the two percentages, the court finds that there exists a genuine issue of material fact with regard to whether McCray has demonstrated discriminatory effect.

McCray still must establish that Dothan has instituted a policy with discriminatory intent, namely that it has "selected or reaffirmed a particular course of action at least in part because of … its adverse effects upon" African–American citizens. *McCleskey v. Kemp*, 481 U.S. 279, 298, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). Aside from the statistical evidence, McCray offers absolutely no evidence upon which the court can infer such intent. This absence is significant insofar as the Supreme Court has accepted even the most sophisticated statistical analyses as proof of discriminatory intent only in "limited contexts." *Id.* at 293, 107 S.Ct. 1756. These involved "stark" patterns which could not be explained by anything other than race. *Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (observing that "such cases are rare"). Absent such contrasts, other "circumstantial and direct evidence" is needed to support a finding of intent. *Id.*

McCray has provided the court with no evidence that any of the disproportionate *Terry* stops were motivated by discriminatory intent. *Cf. Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 95 F.Supp.2d 723, 734–37 (N.D.Ohio 2000) (denying summary judgment to police officers when numerous affidavits *in addition to* statistical evidence raised an inference of discriminatory intent); *but see*

---

**128.** McCray asks that the court at least allow the claim against Woodruff to withstand summary judgment insofar as her development of suspicion upon McCray's refusal to cooperate with her raises an inference that her suspicion was based on his race. Without evidence that Woodruff ever performed a *Terry* stop upon an African–American other than McCray without any basis, the court is reluctant to find that her suspicion in that regard could have been motivated by race. Furthermore, no evidence was provided to suggest how Woodruff responds to uncooperative White citizens. Absent such a showing, there is no genuine issue of fact with regard to discrimination.

*Chavez,* 251 F.3d at 645–48 (holding that statistical evidence is insufficient to raise an inference of intent notwithstanding evidence that officers were trained to consider race as a factor in stopping drivers). McCray has given the court no reason to believe that the officers were simply not lazy in recording their stops, nor that African–Americans in Dothan simply have committed more crimes. In short, as troubling as the statistical evidence appears at first glance, it is not so "stark" as to suggest there is no other explanation for the disparity. Without more, McCray cannot establish a prima facie case of equal protection violation.[129] As such, summary judgment on McCray's race-based equal protection claim against the City is due to be granted.

### E. *Conspiracy*

■■■■ The foregoing discussion applies with equal force to McCray's conspiracy claim under 42 U.S.C. § 1985(3). The elements of a cause of action under § 1985(3) are: "(1) a conspiracy, (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy, (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Lucero v. Operation Rescue,* 954 F.2d 624, 627 (11th Cir. 1992). The second element "requires a showing of some 'racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.'" *Id.* at 628. It follows that if McCray cannot assert a prima facie case of discriminatory intent on the part of any of the officers, then neither can he establish a conspiracy to act in such a manner. *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). Thus, summary judgment is due to be granted on that claim as well.[130]

### F. *Self–Incrimination*

McCray alleges that he was subjected to coerced self-incrimination while in police custody in a manner violative of the Fifth Amendment. McCray asserts the Fifth Amendment claim through § 1983. Defendants contend that because McCray did not assert his right to remain silent and because he did not make any statements that were actually used against him in court, he cannot pursue a claim based on a violation of his Fifth Amendment rights.[131] As will be discussed below, both parties have misstated the scope of such rights.

---

**129.** Moreover, even if the court could infer intent from McCray's statistics, there exists nothing in the record to link the *Terry* stops to the incident which is at the source of the present matter. *See, e.g., Chavez,* 251 F.3d at 646 ("In order to carry their burden, [the plaintiffs] must prove that they were stopped, detained, and searched because the defendant officers involved in *their* stops were motivated by a discriminatory intent.") (emphasis added).

**130.** Furthermore, there is reason to believe that the conspiracy claim would have been vulnerable to summary judgment under the intracorporate conspiracy doctrine which applies to § 1985(3) claims. *See Dickerson v. Alachua County Comm'n,* 200 F.3d 761, 768

(11th Cir.2000). "Under that doctrine, a [municipal] corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves." *Denney v. City of Albany,* 247 F.3d 1172, 1190 (11th Cir.2001); *Godby v. Montgomery County Bd. of Educ.,* 996 F.Supp. 1390, 1412 (M.D.Ala.1998).

**131.** Defendants also argue the Fifth Amendment self-incrimination claim is due to be dismissed because they had a right to obtain information from McCray under §§ 32–1–10, 32–10–2, 32–10–3. For the reasons set forth in the court's discussion of the Fourth Amendment claim, that argument is unavailing.

The relevant language in the Fifth Amendment provides that a person shall not be "compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. That means an individual may choose to remain silent during custodial police questioning and that he suffers no penalty for remaining silent. *Malloy v. Hogan,* 378 U.S. 1, 8, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). It is well-settled that coerced statements obtained during a custodial interrogation are violative of the Fifth Amendment right to be free from self-incrimination. *See, e.g., Adamson v. California,* 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903, (1947); *Brown v. Mississippi,* 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936); *Gray v. Spillman,* 925 F.2d 90, 93 (4th Cir.1991) (finding § 1983 claim stated violation of the Fifth and Fourteenth amendments by alleging use of physical force against a person during custodial interrogation).

 While the text of the Fifth Amendment speaks of compulsion with regard to a criminal proceeding, *Miranda v. Arizona* extended the protections afforded therein to all "custodial interrogations," on the theory that, in the uncomfortable surroundings of a police station, any interrogation is inherently coercive. 384 U.S. 436, 478–79, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Nowhere has McCray alleged he was "in custody" for purposes of the Fifth Amendment's applicability. *See, e.g., Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (holding that Miranda's extension of the Fifth Amendment applies only to questioning directed at a suspect whose freedom of action has been deprived in a significant

way). Indeed, after the touching with the intention of getting McCray to come outside, there is no evidence whatsoever that any questions were directed at McCray. The requests that McCray provide information required by law may have been voiced by an exasperated Woodruff, but such forcefulness alone is insufficient to establish that McCray was "in custody" for purposes of the Fifth Amendment. *See id.* ("Any interview of one suspected of a crime by a police officer will have coercive aspects to it," but the Fifth is not invoked absent "such a restriction on a person's freedom as to render him 'in custody.' ").

Even assuming that the Fifth Amendment protected McCray while he was in the restaurant, the alleged interrogation pertained only to his identification, information not protected by the Fifth Amendment. *Pennsylvania v. Muniz,* 496 U.S. 582, 600–01, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990) (holding that such information in no way imputes criminal wrongdoing and, as such, is not protected by the Fifth Amendment); *see also Lefkowitz v. Turley,* 414 U.S. 70, 77, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973) (holding that the Fifth Amendment protects the right of the individual "not to answer official questions ... where answers might incriminate him in future *criminal* proceedings"). (emphasis added). Woodruff's intentions, right or wrong, were to encourage McCray to comply with the Alabama code requiring the disclosure of such information—such information in no way could have subjected McCray to criminal liability. While the court does not approve of the methods employed therein, they simply do not constitute a violation of the Fifth Amendment.[132] As such, summary judgment is

**132.** Some of the arguments upon which McCray relies are couched in the phraseology of the Fourteenth Amendment's protection of substantive due process. Due process protects all citizens, regardless of whether or not they are in custody, from relentless police questioning aimed at self-incrimination. *See, e.g., Withrow v. Williams,* 507 U.S. 680, 688–89, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993). Courts have found that "coercive law enforcement tactics can violate due process guaran-

due to be granted in favor of the individual officers.

 Because the court determined there was no underlying constitutional violation, McCray's claims against the City must also fail. "An inquiry into a governmental entity's custom or policy is relevant only when a constitutional deprivation has occurred." *Rooney v. Watson,* 101 F.3d 1378, 1380 (11th Cir.1996); *City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) (per curiam) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations may have authorized [a constitutional violation] is quite beside the point."). Where there is no underlying constitutional violation by a municipal actor, liability under § 1983 does not attach to the municipality. *See Vineyard v. County of Murray, Ga.,* 990 F.2d 1207, 1211 (11th Cir.1993) ("Only when it is clear that a violation of specific rights has occurred can the question of § 1983 municipal liability for the injury arise.") The City is, therefore, entitled to summary judgment on the Fifth Amendment claim.

### G. *Malicious Prosecution*

 McCray asserts a Fourth Amendment malicious prosecution claim against all Defendants through § 1983. Since substantive rights do not originate from § 1983, a civil rights plaintiff must allege the violation of a specific constitutional right. *Albright v. Oliver,* 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (citing *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). McCray has alleged that he has been maliciously prosecuted in violation of his Fourth Amendment rights and that he suffered damages as a result of this violation.

 The Fourth Amendment protects against "unreasonable ... seizures." U.S. CONST. amend. IV. Though the Supreme Court has held that there is no substantive due process right under the Fourteenth Amendment to be free from malicious prosecutions, it has never addressed whether malicious prosecution is otherwise actionable under the Fourth Amendment. *Albright,* 510 U.S. at 275, 114 S.Ct. 807. In the Eleventh Circuit, though, it is well-settled that malicious prosecution is actionable if a plaintiff demonstrates a restraint of his liberty consistent with the concept of seizure. *Whiting v. Traylor,* 85 F.3d 581, 584 (11th Cir.1996) (observing that such a claim is cognizable where injuries due to an unlawful seizure follow as the prosecution proceed); *see also Uboh v. Reno,* 141 F.3d 1000, 1002–03 (11th Cir.1998) ("our court ... unequivocally has identified malicious prosecution to be a constitutional tort that is cognizable under § 1983"). In such instances, the "courts historically

tees whether they are successful or not." *Flanigan v. Kent County Sheriff's Dep't,* 817 F.Supp. 660, 664 (W.D.Mich.1993). However, in the event that self-incrimination is not elicited, these unsuccessful tactics violate due process only when the methods employed "shock the conscience." *Id.* at 666–67.

Even taking McCray's facts as true, there is nothing to suggest that the subsequent physical battle was aimed at getting a confession from him, nor does it suggest that it might "shock the conscience." Furthermore, the court is not obligated to research the law on the issue when neither party has raised it.

*See, e.g., GJR Investments, Inc. v. County of Escambia, Fla.,* 132 F.3d 1359, 1369 (11th Cir.1998) ("legal parameters of a given dispute are framed by the positions advanced by the adversaries, and may not be expanded sua sponte by the trial judge"); *Adler v. Duval County Sch. Bd.,* 112 F.3d 1475, 1481 n. 12 (11th Cir.1997) (observing that it is not the court's place "to second guess the litigants before us and grant them relief they did not request, pursuant to legal theories they did not outline, based on facts they did not relate").

have looked to the common law for guidance as to the constituent elements of the claim." *See Uboh,* 141 F.3d at 1004.

■ Under Alabama law, to prevail on a malicious prosecution claim, a plaintiff must show: (1) a prior judicial proceeding was initiated by the present defendant; (2) the defendant acted without probable cause in the prior proceeding; (3) the defendant acted with malice in instituting the prior proceeding; (4) the prior proceeding ended in favor of the plaintiff; and (5) the plaintiff was damaged. *Poff v. Hayes,* 763 So.2d 234, 240 (Ala.2000). McCray never states with particularity which of the Defendants ought to be held liable, or more specifically, which of the officers "initiated" the criminal proceedings. This is the first issue which the court must explore.

The record indicates that Carpenter actually completed the charges although he was not aware of the complete basis for such charges; rather he based his actions upon the reports of all the officers. Yet even these reports offered no clear basis upon which the charges were to be based. Robinson swore out a warrant based solely upon the Woodruff's report which alleged the assault upon Howell and herself. After doing as much he did not independently examine the facts upon which this warrant was based. It is hardly surprising that the charges against McCray were dismissed in the preliminary hearing.

■ However, McCray has not aided the court in its investigation of who to hold liable for malicious prosecution. The general rule is that police officers who merely provide information to the prosecuting officer are relieved from liability on a malicious prosecution claim. *Whiting,* 85 F.3d at 586 n. 10 ("In many cases, arresting officers will not be responsible for the continuation of the prosecution because the prosecutor (or some other factor) will break the causal link between defendants' conduct and plaintiff's injury."). The ex-

ception to this rule is when the officer fraudulently misrepresents the information with the intention of inducing criminal proceedings that otherwise have no merit. *Alabama Power Co. v. Neighbors,* 402 So.2d 958, 964 (Ala.1981). The basis of McCray's claim in this regard is that the criminal proceeding instituted against him was based on Defendants' malice, leading them to misrepresent the incident with the intention of garnering unmerited incarceration against him.

■ As an initial matter, summary judgment should be granted in favor of the City, since, as a matter of law, a municipality is incapable of malice. *Hawkins v. City of Greenville,* 101 F.Supp.2d 1356, 1364 (M.D.Ala.2000). The record indicates that Carpenter, Robinson, Howell, and Ward were merely performing the administrative tasks required of them with regard to the paperwork surrounding the arrest and charges thereafter. Although the reports failed to contain specific information as to the arrest which McCray had allegedly resisted, only Howell witnessed the initiation of the fight firsthand, and even his information as to the facts leading up to his arrival was based on what Woodruff had told them. While Carpenter and Robinson did not take steps to verify this information, the court cannot conclude that the officers' negligence is sufficient to afford a finding that their actions maliciously initiated McCray's criminal case. *See Sheth v. Webster,* 145 F.3d 1231 (11th Cir. 1998) (holding that officer who acted upon the information relayed to him by another was protected by discretionary function immunity against malicious prosecution claim). At a minimum, summary judgment must be granted in favor of these police defendants insofar as they did not play any role in initiating criminal proceedings.

 Woodruff, however, was present on the scene at all times relevant thereto. She filed the report which served as the basis for the criminal charge of assault. In fact, no other report alleged that McCray assaulted anyone, not even Howell's, the officer included in Woodruff's report. According to McCray's version of the facts, this report was based on lies. The criminal prosecution against McCray was dismissed in a preliminary hearing when the judge determined that McCray's response was motivated by Woodruff's unlawful seizure.[133] Woodruff openly disputed the judge's conclusion, believing that, insofar as she was shoved several times by McCray, an assault claim should be proceed forthwith.[134] McCray asks the court to infer malice from Woodruff's steadfastness. While the court is not inclined to conclude this much, it does find that Woodruff's actions raise a genuine issue of material fact such that the court cannot conclude otherwise. *See Delchamps, Inc. v. Bryant,* 738 So.2d 824, 832–33 (Ala.1999) (holding that dismissal of criminal charges at a preliminary hearing is prima facie evidence of absence of probable cause from which a jury can infer malice).

Of course any inference of malice can be rebutted upon a showing of good faith on the part of Woodruff. *Id.* at 833. The test in such an instance is not whether McCray was actually guilty of assault, but whether Woodruff acted in good faith on the appearance of things. *Eidson v. Olin Corp.,* 527 So.2d 1283, 1285 (Ala.1988). A good argument could be made by Woodruff, perhaps, that she honestly believed that her detainment of McCray was justified and, hence, that McCray's retaliation was unwarranted and deserving of criminal punishment. In this vein, it should be observed that, in another Order, the court has allowed Woodruff's counterclaim of assault against McCray to withstand summary judgment. In the present Motion, however, the court must make its decision on the basis of McCray's version of the facts which alleges that he never acted violently toward her. In other words, there is a genuine issue of material fact and summary judgment is to be denied.

In defense to the malicious prosecution claim, Woodruff argues that she is entitled to qualified immunity because arguable probable cause existed to arrest McCray. "A substantive element of the claim of malicious prosecution is the absence of probable cause." *Smith v. Vaughn,* 946 F.Supp. 957, 962 (M.D.Fla.1996). Stated differently, "if there are undisputed facts in the record establishing that the defendant had probable cause to pursue the criminal indictments, the plaintiff cannot recover for malicious prosecution." *U.S. Steel, LLC, v. Tieco, Inc.,* 261 F.3d 1275, 1290–91 (11th Cir.2001). The court has already determined elsewhere in this opinion that, viewing the evidence in the light most favorable to McCray, Defendants did not have arguable probable cause to arrest McCray. To the extent that the criminal charges of assault were instituted solely upon this arrest and the testimony of Woodruff, the court finds that no reasonable officer would have believed herself justified in falsely arresting a citizen and then providing false affidavits in support thereof. *See NAACP v. Hunt,* 891 F.2d 1555, 1563 (11th Cir.1990) (recognizing "a federal right to be free from malicious prosecutions"). Insofar as there is a genuine issue of material fact as to whether Woodruff's actions satisfy this standard, she is not entitled to summary judgment.

## H. *Deliberate Indifference to Serious Medical Needs*

 McCray next argues that Defendants have violated McCray's due pro-

---

**133.** Woodruff Dep. 144:2–15.

**134.** *Id.*

cess rights by refusing him medical treatment for a period of five hours.[135] "The minimum standard for providing medical care to a pretrial detainee under the Fourteenth Amendment is the same as the minimum standard required by the Eight Amendment for a convicted prisoner; both the right to due process and the right to be free from cruel and unusual punishment are violated by a government official's deliberate indifference to serious medical needs." *Lancaster v. Monroe County, Alabama*, 116 F.3d 1419, 1425 n. 6 (11th Cir.1997). The analysis of a claim of deliberate indifference has three components: (1) subjective knowledge of a serious medical need; (2) disregard of the risk posed by that need; (3) by conduct that is more than mere negligence. *McElligott v. Foley*, 182 F.3d 1248, 1255 (1999).

■ "A 'serious medical need' is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Greffey v. State of Ala. Dept. of Corrections*, 996 F.Supp. 1368, 1381 (N.D.Ala.1998) (quoting *Hill v. Dekalb Regional Youth Detention Center*, 40 F.3d 1176, 1187 (11th Cir.1994)). McCray has directed the court to various opinions of the Eleventh Circuit, asking that they be read to stand for the proposition that injuries following from a recent traumatic injury generally constitute a serious medical need. *See, e.g., Barfield v. Brierton*, 883 F.2d 923, 938 (11th Cir.1989) (beating and sexual assault); *Thomas v. Town of Davie*, 847 F.2d 771 (11th Cir.1988) (automobile accident); *H.C. by Hewett v. Jarrard*, 786 F.2d 1080, 1086, 1086–87 (11th Cir.1986) (soft-tissue shoulder injury); *Aldridge v. Montgomery*, 753 F.2d 970, 972–73 (11th Cir.1985) (one-and-half-inch bleeding cut under the eye). While McCray's incident may well have been a traumatic experience,[136] the court finds that more pertinent to this discussion is the effect rather than the cause of the injury. The term "traumatic" is no more helpful than "serious" in elucidating the appropriate standard, but the cases together reassert the principle that the court should be wary of "pain and suffering which no one suggests would serve any penological purpose." *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

In the instant case, McCray shows that he sustained an array of serious and painful injuries following from his arrest including an acute cervical myofacial strain, abrasions and contusions. McCray fails to point out, however, the fact that, in plain English, such injuries fall just to the north of a few cuts and bruises. Indeed, when he finally received treatment five hours later, he was given some aspirin and a splint and he was advised to limit strenuous exertion for the immediate future. At the most, the seriousness of the injury is questionable, at least as far as constitutional requirements are concerned. *Compare Aldridge*, 753 F.2d at 972 (seri-

---

**135.** McCray has pleaded his claim under the Fifth Amendment. However, a state official's treatment of a pre-trial detainee is governed by the Eighth Amendment as incorporated through the Due Process Clause of the Fourteenth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). The Fourteenth Amendment "does require the responsible government or governmental agency to provide medical care to persons ... who have been injured while being apprehended by the police. In fact, the due process rights of a [pre-trial detainee] are at least as great as the Eighth Amendment protections available to a convicted prisoner." *City of Revere v. Massachusetts General Hospital*, 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983).

**136.** Specifically, he shows that his injuries were caused when police officers slammed his face into a table which broke, threw him to the floor and put him a choke hold.

ousness of inch-and-a-half cut requiring suturing is jury question) *with Martin v. Gentile,* 849 F.2d 863, 871 (4th Cir.1988) (sliver of glass in prisoners hand, while "no doubt uncomfortable," was not a "serious injury" because it did not require stitches or painkillers).

The seriousness of the injury, though, is merely a variable in the determination of the risk imposed by unreasonable delay. The immediacy with which prior defendants have been required to treat inmates' injuries has been greater when the danger to the inmate's well-being was both obvious and imminent. *Hill,* 40 F.3d at 1187 (listing cases). On the other hand, "delay or even denial of medical treatment for superficial, nonserious physical conditions" does not offend the Constitution. *Id.* at 1187–88. McCray shows that his clothing was bloodied after his altercation with the police defendants and, although he was unable to verbally communicate to them he was injured, he did gesture that he was in pain and in need of medical attention. Although an ambulance was summoned for Woodruff, none of the officers present during the arrest attempted to obtain medical attention for McCray. After he got to the jail, although McCray's relatives also requested medical attention on his behalf, he was not permitted to seek medical treatment for his injuries for five hours.

■ "Even where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable." *McElligott v. Foley,*

182 F.3d 1248, 1255 (11th Cir.1999). Defendants argue that no treatment was provided because they did not believe the injury to be a serious one. Taken as true, the court could not find that the refusal was based in deliberate indifference to McCray's well-being. However, in the face of repeated requests for medical assistance from both McCray and his family, the court cannot readily dismiss the possibility that wantonness played a role in Defendants' decision.

The police possess neither the right nor the authority to ignore the needs of people within their custody. Refusal to provide medical care arises to constitutional importance when the refusal is "tantamount to unnecessary and wanton infliction of pain." *Brown v. Hughes,* 894 F.2d 1533, 1537 (11th Cir.1990). On the other hand, in order to survive summary judgment, McCray is required to demonstrate more than mere negligence on the part of Defendants. *McElligott,* 182 F.3d at 1255. Undoubtedly McCray would have preferred to take his Advil earlier than he did; the court sympathizes with the pain endured in the interim. However, nothing in the nature of his injury suggested imminent risk of intensified pain nor even of enduring pain throughout the delay. Even if McCray has raised an issue of fact with regard to Defendants' mental state in delaying his medical treatment, the court is not persuaded that a reasonable jury could infer the brand of wantonness typified in the present standard given the relatively mild nature of McCray's injuries. This is especially so given that Defendants did eventually provide treatment. As such, the court grants summary judgment in favor of all Defendants.[137]

---

**137.** The City's Motion would be granted notwithstanding the outcome of the officer defendants' Motion since McCray has failed to provide sufficient evidence to raise the inference that delays in medical care are a "policy or custom" of the Dothan police force. *See Williams v. Albany,* 936 F.2d 1256, 1261 (holding a single incident is insufficient evidence from which to infer a municipal policy).

While this may be a close call for summary judgment purposes, even were the court to conclude that an issue of fact remained for a jury's determination, Defendants would still be entitled to summary judgment on the grounds of qualified immunity. To be sure, at the time of McCray's jail detention, "it was clearly established that knowledge of the need for medical care and intentional refusal to provide that care constituted deliberate indifference." *Harris v. Coweta County,* 21 F.3d 388, 393 (11th Cir.1994). For purposes of qualified immunity, however, the clearly established law must have given Defendants some idea of the length of delay that would be deemed inappropriate in light of the particular medical need. *Id.* The closest that any case comes in this regard is *Aldridge v. Montgomery,* 753 F.2d 970 (11th Cir.1985).

In *Aldridge,* a detained suspect was made to wait 2 ½ hours while an inch-and-a-half long gash was bleeding profusely across the holding cell. *Id.* at 972. The Eleventh Circuit reversed the lower court's ruling on the judgment as a matter of law, holding that the unreasonableness of the present delay was a question for the jury. However, the claim of indifference against the jail was also based upon the refusal to apply ice or to give the detained aspirin, as prescribed by the doctor; in other words, the jury issue was raised on the totality of circumstances, including defendant behavior after the plaintiff had seen a doctor. *Id.* The Eleventh Circuit made no distinction between the facts, though the bulk of its discussion pertained to the treatment of the prisoner after his return from the doctor. The latter factual scenario is undoubtedly more indicative of

deliberate inaction, thus suggesting a stronger role in the Eleventh Circuit's insistence that a jury hear all the facts. The court is persuaded that, at the very least, the *Aldridge* decision does not clearly establish the proposition that some amount of bleeding, not requiring stitches, in the absence of evidence of indifference, is a constitutional violation. Therefore, qualified immunity is appropriate, and summary judgment is due to be granted to all Defendants.

## I. *State Law Claims*

### 1. Discretionary Function Immunity

The police defendants assert that the state law claims for assault,[138] false imprisonment and malicious prosecution are due to be dismissed on the basis of discretionary function immunity because arguable probable cause existed for McCray's arrest.[139] For municipal police officers, discretionary function immunity is derived from statutory law. *See Sheth v. Webster,* 145 F.3d 1231, 1236 (11th Cir. 1998). Alabama Code § 6–5–338 provides, in relevant part, as follows:

> (a) Every peace officer ... who is employed or appointed pursuant to the Constitution or statutes of this state, whether appointed or employed as such peace officer by the state or a county or a municipality thereof ... shall have immunity from tort liability arising out of his or her conduct in the performance of any discretionary function within the line and scope of his or her law enforcement duties.

A recent case from this district is instructive on the application of this doctrine. In *Richards v. Southeast Alabama Youth*

---

**138.** Since Plaintiffs concede that Robinson was not involved in the incidents surrounding McCray's arrest, it is evident that the state law claims against him are due to be dismissed.

**139.** The police defendants do not separately address whether McCray has established a prima facie case with respect to these substantive state claims.

*Services Diversion Center,* 105 F.Supp.2d 1268, 1282 (M.D.Ala.2000), the court stated as follows:

> In applying statutory discretionary function immunity, the court will look to definitions of discretionary acts which have been applied by the Supreme Court of Alabama. Discretionary acts have been defined as "those acts as to which there is no hard and fast rule as to the course of conduct that one must or must not take and those acts requiring exercise in judgment and choice and involving what is just and proper under the circumstances." (citations omitted).

However, discretionary function immunity does not apply to acts which are willful, malicious or taken in bad faith. *Couch v. City of Sheffield,* 708 So.2d 144, 153 (Ala. 1998).

The state law claim for malicious prosecution is to be treated in a fashion similar to the discussion above insofar as the same test applies with regard to the cause of action. For the reasons discussed above, the cause of action for malicious prosecution is dismissed against all officer defendants save Woodruff. For the same reasons proffered for refusing to grant Woodruff qualified immunity, the court refuses her discretionary function immunity. The court thus turns to the factual premise as set forth by McCray to determine whether the police defendants are entitled to discretionary function immunity on the assault and false imprisonment claims.

■ It is undisputed that the police defendants were employed with the City of Dothan Police Department at the time they acted. They are, therefore, municipal police officers within the meaning of the statute.[140] Under Alabama law, the police defendants were performing discretionary acts to the extent those actions as alleged

in the complaint were performed in the line and scope of their duties as police officers and required "exercise in judgment and choice and involving what is just and proper under the circumstances." *See Ex parte Cranman,* 2000 WL 1971903, at *1 (Ala. June 16, 2000) (noting that discretionary function immunity extends to the act of making or attempting to make an arrest).

Because the police defendants have shown their actions were discretionary, in order to strip them of immunity, McCray must demonstrate that Defendants acted in bad faith, with malice or willfulness. *Wright v. Wynn,* 682 So.2d 1, 2 (Ala.1996); *Moore v. Adams,* 754 So.2d 630, 632 (Ala. 1999). "The [government defendants] are entitled to discretionary-function immunity if, on the summary-judgment facts, their acts at the scene were discretionary and [the plaintiff] has not presented evidence sufficient to create a jury question regarding whether they 'acted in bad faith, [or] with malice or willfulness.'" *Scarbrough v. Myles,* 245 F.3d 1299, 1303 n. 9 (11th Cir.2001) (citing *Taylor v. Adams,* 221 F.3d 1254, 1261 (11th Cir.2000)).

Here, McCray has adduced evidence sufficient to raise an inference that the police defendants acted in bad faith, or with malice, or willfulness. In particular, McCray shows that the police defendants unlawfully stopped and arrested him, used force in effecting the arrest, and that they deliberately misstated that he resisted arrest and assaulted Woodruff and Howell for the purpose of having a warrant issued. *Compare Sheth,* 145 F.3d at 1239 (discretionary function applied where there was no evidence that police officer "knew that the arrest was unlawful, or that he knew that the use of force in subduing and hand-

---

**140.** "Pursuant to § 6–5–338(a) ... municipal police officers, are entitled to the same discretionary function immunity as are state officers who are not constitutional officers." *Hardy v. Town of Hayneville,* 50 F.Supp.2d 1176, 1195 (M.D.Ala.1999).

cuffing the plaintiff was unreasonable, or that he had any hand in the prosecution of the plaintiff"). The foregoing evidence presents facts from which a reasonable jury could infer bad faith, malice or willfulness.[141] *See Walker v. Briley,* 140 F.Supp.2d 1249, 1263 (N.D.Ala.2001) (plaintiff made sufficient showing of malice and summary judgment on ground of discretionary function immunity denied where "the evidence, viewed most favorably to [plaintiff], suggest[ed] that [police officer] had no grounds to believe [plaintiff] had committed any offense whatsoever but rather simply did not like [plaintiff] questioning his authority or suggesting racist motivations"). Thus, McCray has presented evidence sufficient to create a genuine issue of material fact as to whether police defendants had the requisite state of mind to defeat application of discretionary function immunity on the false arrest and assault claims.

### 2. Tort of Outrage

Lastly, Defendants contend that summary judgment is appropriate as to Plaintiffs' claims for intentional infliction of emotional distress because the evidence does not support an inference that the claims are within the narrow ambit of factual situations in which the Alabama Supreme Court has permitted outrage claims. For the reasons which follow, the court agrees.

■ A plaintiff attempting to prove the tort of outrage bears a heavy burden. *Ex parte Crawford & Co.,* 693 So.2d 458 (Ala. 1997). In order to survive summary judg-

ment, the plaintiff must adduce evidence that the defendants engaged in conduct "so outrageous in character and extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *American Road Serv. Co. v. Inmon,* 394 So.2d 361, 365 (Ala.1980). The Alabama Supreme Court has strictly construed the *Inmon* test. *Nabors v. St. Paul Ins. Co.,* 489 So.2d 573, 574 (Ala. 1986); *Thomas v. BSE Industrial Contractors, Inc.,* 624 So.2d 1041, 1044 (Ala. 1993) ("in the 12 years since Inmon was decided, all cases in which this court has found a jury question on an outrage claim have fallen within only three categories: 1) cases having to do with wrongful conduct in the context of family burials ... 2) a case where insurance agents employed heavy handed, barbaric means in attempting to coerce the insured into settling an insurance claim ... 3) a case involving egregious sexual harassment"); *House v. Corporate Services, Inc.,* 882 F.Supp. 161, 165 (M.D.Ala.1995) (noting that "the Alabama Supreme Court is not predisposed to recognize that tort of outrage claims present jury questions"). Additionally, that court has clarified that plaintiff claiming outrage must show: "(1) that the defendant's conduct was intentional or reckless; (2) that it was extreme and outrageous; and (3) that it caused emotional distress so severe that no reasonable person could be expected to endure it." *Ex parte Crawford,* 693 So.2d at 460.

---

141. *See Williams v. City of Montgomery, Ala.,* 48 F.Supp.2d 1317, 1328 (M.D.Ala.1999) (" 'Wilfulness' is the conscious doing of some act or omission of some duty, under knowledge of existing conditions accompanied with a design or purpose to inflict injury.") *Reed v. Brunson,* 527 So.2d 102, 119 (Ala.1988). Legal malice may be defined as "the intentional doing of a wrongful act without just cause or excuse, either with an intent to in-

jure the other party or under such circumstances that the law will imply an evil intent." *Empiregas, Inc. v. Feely,* 524 So.2d 626, 628 (Ala.1988). "Bad faith," as defined by Black's Law Dictionary and adopted by the Alabama Supreme Court, "contemplates a state of mind affirmatively operating with furtive design or ill will." *In re Sheffield,* 465 So.2d 350, 359 (Ala.1984).

In the instant case, as evidence that Defendants' conduct was outrageous, McCray shows that police attacked him in the presence of his children, choked him, and falsely arrested him. Thereafter, they left the distraught children in the care of strangers. Then, the police maliciously prosecuted McCray. Even if true, nothing in the foregoing facts suggests to the court that Plaintiffs have satisfied the second and third elements of the tort of outrage. "There can be no recovery for the tort of outrage unless all ... elements are established." *U.S.A. Oil, Inc. v. Smith*, 415 So.2d 1098, 1100 (Ala.Civ.App.1982). As earlier stated, the Alabama Supreme Court has "limited the outrage cause of action to egregious circumstances." *Callens v. Jefferson County Nursing Home*, 769 So.2d 273, 281 (Ala.2000). That court has not expanded the tort of intentional infliction of distress to include any context similar to the present case. *See Newton v. Town of Columbia*, 695 So.2d 1213, 1218 (Ala.Civ.App.1997) (observing that assault does not "necessarily constitutes extreme and outrageous conduct sufficient to support an action for intentional infliction of emotional distress").

Moreover, although the police defendants' conduct as depicted by Plaintiffs was unseemly, it was not "so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Inmon*, 394 So.2d at 365. While Plaintiffs have shown they experienced some degree of emotional distress as a result of their interactions with the police defendants, no Plaintiff has presented evidence of "emotional distress so severe that no reasonable person could be expected to endure it." *Ex parte Crawford*, 693 So.2d at 460; *U.S.A. Oil, Inc. v. Smith*, 415 So.2d at 1100–01 (evidence that the plaintiff could not sleep, was upset, and cried often, was not severe enough to support an outrage claim). Since Plaintiffs' evidence fails to meet the stringent requirements set forth in *Inmon*, Defendants are entitled to summary judgment on this claim.

## VI. ORDER

Based on the foregoing, it is CONSIDERED and ORDERED that Defendants' Motions For Summary Judgment (Doc. Nos. 75, 76) be and the same are hereby GRANTED in part and DENIED in part as follows:

a. GRANTED on Plaintiff Douglas McCray's § 1983 Fifth Amendment self-incrimination claim against all Defendants.

b. GRANTED on the state law claim against all Defendants for intentional infliction of emotional distress brought by Plaintiff Douglas McCray and his minor children, Douglas and Ariel McCray. There being no remaining claims asserted by the minor children, these plaintiffs be and the same are hereby DISMISSED as parties in this action.

c. GRANTED on Plaintiff Douglas McCray's § 1983 Fourteenth Amendment deliberate indifference claim against all Defendants.

d. GRANTED on Plaintiff Douglas McCray's § 1983 malicious prosecution claim, as well as the state law malicious prosecution claim, against the City of Dothan, Jeffrey Howell, Tim Ward, Greg Carpenter, David Carmichael, and Stacy Robinson.

e. GRANTED on Plaintiff Douglas McCray's § 1983 equal protection claims based on race and disability as to all Defendants.

f. GRANTED on Plaintiff Douglas McCray's § 1983 Fourth Amendment unlawful seizure claim against Defendants Tim Ward, Greg Carpen-

ter, David Carmichael, and Stacy Robinson.

g. GRANTED on Plaintiff Douglas McCray's state-law assault and false imprisonment claims against Defendant Stacy Robinson. There being no remaining claims asserted against Robinson, this defendant be and the same is hereby DISMISSED as a party in this action.

h. The Motions For Summary Judgment are DENIED in all other respects.